UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **EDITH FUOG,** individually and on behalf of those similarly situated,<br><br>               Plaintiff,<br>vs.<br><br>**CVS PHARMACY, INC.,**<br>**CAREMARK PHC, LLC**,<br><br>         Defendants. | CLASS ACTION<br><br>Case No. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CLASS ACTION COMPLAINT

Plaintiff Edith Fuog, by and through her undersigned counsel, brings this class action lawsuit for violations of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq., the Rehabilitation Act of 1973, 29 U.S.C. §701, et seq., and the Affordable Care Act, 42 U.S.C. §18116, *et seq.*  In support, Plaintiff alleges the following:

### I.

### NATURE OF THE ACTION

1.      This is a putative class action brought through Fed. R. Civ. P. 23.  It is brought by an individual on her own behalf and on behalf of all others similarly situated, against one of the country's largest pharmacy chains owned, operated and/or controlled by CVS Pharmacy, Inc. and/or Caremark PHC, LLC (collectively "CVS" or "Defendants").

2.      This class action seeks to recover from CVS damages and injunctive relief for their corporate wide discriminatory practices in refusing to fill, without a legitimate basis, valid and legal prescriptions for opioid medication of Plaintiff and the Class Members, protected individuals under federal law.

## II.

## THE PARTIES

3.     Plaintiff Edith Fuog is an individual residing in Riverview, Florida. Ms. Fuog suffers from numerous diseases resulting in her suffering from chronic pain.

4.     Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.  It can be served through its registered agent for process, CT Corporation, System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, R.I. 02914.

5.     Defendant Caremark PHC, LLC is a Delaware limited liability company with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.  It can be served through its registered agent for process, CT Corporation, System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, R.I. 02914.

6.     Defendants are jointly referred to as "CVS" or "Defendants."

7.     CVS, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor and operates retail stores throughout the United States, including in Rhode Island, that dispense and sell prescription medicines, including opioids.  Caremark PHC provides prescription benefit management services.

## III.

## JURISDICTION AND VENUE

8.     This Court maintains jurisdiction over the parties to this action. Defendants are citizens of the State of Rhode Island, with their principal place of business located within this District.  The members of the Class are resident citizens of Rhode Island as well as other states where Defendants conduct business.

9.      This Court has subject matter jurisdiction over this action.  Federal question jurisdiction exists based on the assertion of claims for violations of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq., the Rehabilitation Act of 1973, 29 U.S.C. §701, et seq., and the Affordable Care Act, 42 U.S.C. §18116, *et seq*.

10.     This Court also has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). CAFA's requirements are satisfied in that (1) the members of the Class exceed 100; (2) the citizenship of at least one proposed Class member is different from that of the Defendants; and (3) the matter in controversy, after aggregating the claims of the proposed Class Members, exceeds $5,000,000.00, exclusive of interest and costs.

11.     This Court has general diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between the named Plaintiff and the Defendants.

12.     Additionally, this Court has jurisdiction pursuant to 28 U.S.C. §1343(a)(4) in that this action seeks to recover damages or to secure equitable relief under an Act of Congress providing for the protection of the Plaintiff's and the Class Members' civil rights.

13.     Venue is proper in this District under 28 U.S.C. §1391.

## IV.

## CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action on behalf of herself and all others similarly situated, pursuant to Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, and is a member of, and seeks to represent, a class of persons defined as:

> All persons residing in the United States during the period of January 1, 2013 to present, who were issued prescriptions for opioid medication by a licensed medical provider as part of medical treatment for (i) chronic pain, defined as pain lasting 3 or more months, from any cause (ii) pain associated with a cancer diagnosis or

treatment (iii) palliative or nursing home care or (iv) sickle cell anemia and were either (a) unable to get any such prescription(s) filled, (b) unable to get any such prescription(s) filled as written, (c) required to submit non-opioid prescriptions or purchase other products in conjunction with their opioid prescription(s) or (d) told that their prescriptions for opioid medication would no longer be filled or no longer be filled as written at any pharmacy owned, controlled and/or operated by the Defendants in the United States (collectively referred to as the "Class").

Excluded from the Class are:

a.  The officers and directors of any Defendant and their immediate family;

b.  Any judge or judicial personnel assigned to this case and their immediate family;

c.  Any legal representative, successor or assignee of any excluded person or entity.

### Numerosity of the Class (Fed. R. Civ. P. 23(a)(1))

15.     The members of the national putative class are so numerous that joinder of all members is impracticable.  Plaintiffs estimate the number of Class Members to be in the tens of thousands or more similarly situated individuals nationwide.

16.     The Class Members are identifiable using methods of assessment and/or records maintained in the ordinary course of business by the Defendants.

17.     Notice may be provided to the Class Members by publication, first-class mail and/or other means.

### Commonality (Fed. R. Civ. P. 23(a)(2))

18.     Common questions of law and fact exist as to all Class Members and predominate over questions affecting individual Class Members.  Among the questions of law and fact common to the putative class are:

a. Whether Defendants improperly refused to fill the Class' legitimate prescriptions for opioid medication;

b. Whether Defendants implemented express and/or implicit state-wide and/or national policies regarding the filling of opioid prescriptions which misinterpret and/or misapply applicable guidelines and laws;

c. Whether Defendants implemented or created state-wide and/or national databases and/or used data analytical tools as part of determining whether to fill the Class' opioid prescriptions;

d. Whether Defendants "profiled" persons presenting prescriptions for opioid pain medication on a state-wide and/or national basis;

e. Whether Defendants' express and/or implicit policies regarding the filling of prescriptions for opioid medication interfere with the Class' relationship with their physicians;

f. Whether Defendants' express and/or implicit policies regarding the filling of prescriptions for opioid medication impose unnecessary requirements that increase the cost and expense to the Class;

g. Whether Defendants' express and/or implicit policies, resulting in the refusal to fill the Class' opioid prescriptions violate the ADA and/or Section 504 of the Rehabilitation Act; and

h. Whether Defendants' express and/or implicit policies, resulting in the refusal to fill Plaintiffs opioid prescriptions violate the Anti-Discrimination provisions of the ACA.

19. Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

**Typicality (Fed. R. Civ. P. 23(a)(3))**

20. The claims of the representative Plaintiff are typical of the claims of the Class. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all members of the Class. Plaintiff has been damaged by the same wrongful conduct by Defendants and suffered injuries similar in kind and degree to the injuries suffered by all putative class members. Plaintiff makes the same claims and seeks the same relief for herself and for all Class Members.

**Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**

21.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex class actions. Neither Plaintiff nor her Counsel have interests adverse to those of the Class.

**Superiority of Class Action (Fed. R. Civ. P. 23(b)(2))**

22.     Absent class treatment, Plaintiff and Class Members will continue to suffer harm as a result of Defendants' unlawful and wrongful conduct. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Without a class action, individual Class Members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights.  Because of the ratio of the economic value of the individual Class Members' claims in comparison to the high litigation costs in complex cases such as this, few could likely seek their rightful legal recourse.  Absent a class action, Class Members will continue to incur harm without remedy.

**Superiority of Class Action (Fed.  R.  Civ.  P.  23(b)(3))**

23.     Proceeding on a class wide basis is a superior method for the fair and efficient adjudication of the controversy because class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort, judicial resources,  and expenses that individual actions would entail.  Class treatment will allow Class Members to seek redress for injuries that would not be practical to pursue individually because the damages suffered by the individual members of the putative class is relatively small compared to the burden and expense of individual litigation of their claims against the Defendants. These benefits substantially outweigh any difficulties that could arise out of class treatment.

24.     Moreover, prosecuting separate actions by individual Class Members would create a risk of:

> (A) inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the Defendants; and/or

> (B) adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

25.     Plaintiff knows of no difficulty that will arise in the management of this litigation that would preclude its maintenance as a class action.

26.     Finally, Defendants have acted or refused to act, on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

**V.**

**GENERAL BACKGROUND**

27.     Over the past few years, it has been well publicized that there is a national problem with opioid abuse alleged to result from the aggressive and misleading marketing of opioid medication by various pharmaceutical companies manufacturing such medication.  To combat this problem, steps have been taken to limit production of and access to opioid medication.

28.     What has not been as widely publicized is the effect these steps have had on innocent and legitimate users of opioid medication suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia.  These innocent and legitimate users have been denied access to necessary medication, arbitrarily treated as criminals and/or drug addicts and forced to incur unnecessary additional expenses to obtain opioid medication prescribed for legitimate medical needs as determined by their treating medical providers, all while suffering from debilitating pain.

29.     Chronic pain, typically defined as pain lasting three months or more, is one of the most common health problems in the United States.  An estimated 40 million adults in the United States have high levels of pain every day, and these individuals report worse health, use the health care system more frequently, and are more likely to receive disability benefits.[1]

30.     In 2016, the Global Burden of Disease Study estimated that low back pain and migraines were among the five leading causes of ill-health and disability - and the leading cause in high-income, high-middle-income, and middle-income countries.[2]

31.     According to the Centers for Disease Control ("CDC"), in 2016 alone, an estimated 50 million Americans suffered from chronic pain with about 20 million Americans experiencing high impact chronic pain, defined as chronic pain that limited life or work activities on most days for the prior six (6) months.[3]  Of the 20 million experiencing high impact chronic pain, 78% (more than 15 million) were age 45 years and older.

32.     Chronic pain has serious ramifications, not just physically but also psychologically. Depression and anxiety disorders are much more prevalent in individuals experiencing chronic pain than in those who do not.[4]  A number of studies have demonstrated that chronic pain patients have an increased risk of suicide, even when controlling for other factors such as socioeconomic

---

[1]     Richard L. Nahin, "Estimates of Pain Prevalence and Severity in Adults: United States, 2012," The Journal of Pain, 2015 Aug; 16(8): 769-780, doi: 10.1016/j.jpain.2015.05.002.
[2]     GBD 2016 Disease and Injury Incidence and Prevalence Collaborators, "Global, Regional, and National Incidence, Prevalence, and Years Lived With Disability for 328 Diseases and Injuries for 195 Countries, 1990-2016: A systematic Analysis for the Global Burden of Disease Study 2016," The Lancet, September 16, 2017, doi: 10.1016/S0140-6736(17)32154-2.
[3]     Dahlhamer, J., J., Lucas, C., Zelaya, et al. 2019. Prevalence of Chronic Pain and High-Impact Chronic Pain Among Adults - United States, 2016. *MMWR*, 67, no. 36:1001–1006.   Retrieved from https://www.cdc.gov/mmwr/volumes/67/wr/mm6736a2.htm.
[4]     Oye Gureje, et al., "Persistent Pain and Well-Being: A World Health Organization Study in Primary Care," JAMA, 1998; 280(2): 147-151, doi: 10.1001/jama.280.2.147.

status, general health, and psychological disorders.[5]  Chronic pain patients also often experience a sense of hopelessness and catastrophic thoughts from the fear that their pain may never go away.[6]

33.     There is a well-studied correlation between chronic pain and suicidal behavior. Involuntarily tapering or deprivation of a patient of opioid medication, particularly those who have been on high-dose opioids for long periods, has major physical and mental health repercussions and has been shown to increase the risk of suicidal behavior.  One study found that 9.2% of involuntarily tapered patients reported suicidal thoughts to their healthcare provider while 2.4% attempted suicide.[7]  The study's authors believe that these incidents were underreported.

34.     Chronic pain can result from a wide range of causes, such as traumatic injury, medical treatment, inflammation, or neuropathic pain.[8]  Patients with the same diagnosis can have different pain levels.  Because chronic pain has such diverse causes and wide-ranging effects, it poses challenges to treatment.[9]

35.     Patients react (and fail to respond) to a wide range of interventions for their pain.[10] The 2011 Institute of Medicine (IOM) report "Relieving Pain in America" suggests that it is for these reasons that a simplistic medical approach, in which doctors diagnose and "cure" patients, might not be the norm for patients suffering chronic pain.  It cautions that the "road to finding the right combination of treatments ... may be a long one."[11]

---

[5]     Alfton Hassett, Jordan Aquino, and Mark llgen, "The Risk of Suicide Mortality in Chronic Pain Patients," Current Pain and Headache Reports (2014) 18:436, doi: 10.1007/511916-014-0436-1.

[6]     Nicole Yang and Catherine Krane, "Suicidality in Chronic Pain: A Review of the Prevalence, Risk Factors, and Psychological Links," Psychological Medicine, May 2006, doi: 10.1017/50033291705006859.

[7]     Demidenko MI, et al., Suicidal ideation and suicidal self-directed violence following clinician-initiated prescription opioid discontinuation among long-term opioid users, Gen Hosp Psychiatry. 2017 Jul;47:29-35. doi: 10.1016/j.genhosppsych.2017.04.011. Epub 2017 Apr 27,  p. 29.

[8]     Institute of Medicine of the National Academies, Relieving Pain in America: A Blueprint for Transforming Prevention, Care, Education, and Research (Washington: IOM, 2011), p. 35.

[9]     Ibid., p. 116

[10]    Courtney Lee, et al., "Multimodal, Integrative Therapies for the Self-Management of Chronic Pain Symptoms," Pain Medicine, vol. 15 (April 2014), p. S76-S85, doi: 10.1111/pme.12408.

[11]    Institute of Medicine, p. 126

36.    Chronic pain was often undertreated before the 1990s.[12]  During that decade, patient advocates, pain specialists, and medical organizations increasingly drew attention to the suffering of chronic pain patients and began calling on practitioners to take greater steps to alleviate patient suffering, including by prescribing opioid analgesics.[13]

37.    Toward the mid-2000s, public health officials began noticing an uptick in overdose deaths involving opioids, which set off a major debate about the appropriateness of prescribing these medications for both acute and chronic pain.

38.    As a result, government agencies sought to limit the supply and use of prescription opioids in the U.S., encourage more conservative prescribing practices, strengthen oversight over the use of these medicines, and crack down on fraudulent prescribing and marketing practices.

39.    However, reducing the prescribing of opioid analgesics poses significant challenges for patients with legitimate medical problems.  Moreover, many chronic pain patients are already taking opioid analgesics, and many have done so for years.

40.    In 2010, the CDC began developing a guideline to provide "better clinician guidance on opioid prescribing and in 2016 issued its Guideline for Prescribing Opioids for Chronic Pain" ("CDC Guideline") "[14], which was intended as a voluntary set of recommendations aimed at primary care providers.

41.    At the 2018 Annual Meeting of the American Medical Association ("AMA"), the AMA House of Delegates referred the second resolve of alternate Resolution 235, "Inappropriate Use of CDC Guidelines for Prescribing Opioids" to its Board of Trustees, which asked:

---

[12]    See, for example, The Joint Commission's Pain Standards: Origins and Evolution, May 5, 2017 https://www.jointcommission.org/assets/1/6/Pain_Std_History_Web_Version_o5122m7.pdf   (accessed   September 28, 2018).
[13]    Institute of Medicine, pp. 45-47.  Also: https://www.ncbi.nlm.nih.gov/pubmed/2873550.
[14]    Centers for Disease Control and Prevention, CDC Guideline for Prescribing Opioids for Chronic Pain United States, 2016, March 18, 2016, https://www.cdc.govimmwrivolumes/65/rrirr65olei.htm?CDC_AA_refVal=https %3A%2F%2Fwww.cdc .gov%2Fmmwr%2Fvolumes%2F65%2Frr%2Frr65oleier.htm (accessed Sept. 15, 2018).

[T]hat our AMA actively continue to communicate and engage with the nation's largest pharmacy chains, pharmacy benefit managers, National Association of Insurance Commissioners, Federation of State Medical Boards, and National Association of Boards of Pharmacy in opposition to communications being sent to physicians that include a blanket proscription against filing prescriptions for opioids that exceed numerical thresholds without taking into account the diagnosis and previous response to treatment for a patient and any clinical nuances that would support such prescribing as falling within standards of good quality patient care.[15]

42.      In 2019, the AMA Board of Trustees issued Report 22-A-19[16] in response, which

provides in relevant part:

The nation's opioid epidemic has led to extensive policy development in multiple areas - from several hundred new state laws and regulations to hundreds of millions of dollars earmarked by federal legislation for treatment of opioid use disorder, harm reduction efforts and other initiatives.

*   *   *

That is not, however, the only type of policymaking that has occurred.  Health insurance companies, national pharmacy chains and pharmacy benefit management companies (PBMs) all have - to varying degrees - implemented their own policies governing physician prescribing of controlled substances as well as patients' abilities to have a controlled substance prescription dispensed to them.  The result of this type of quasi-regulation is incredibly difficult to quantify on a large-scale basis due to the lack of transparency in the public sphere, but the AMA and many medical societies continue to receive concerns from physicians and patients as to the disruptive nature of health plan, pharmacy chain or PBM interference in the patient-physician relationship.

*   *   *

.  .  . [N]ational pharmacy chains, health insurance companies and PBMs have implemented their own restrictive opioid prescribing policies.  This report will not detail every iteration and difference between the policies except to say that most of the policies are some variation of the "CDC Guideline for Prescribing Opioids for Chronic Pain - United States, 2016" (the CDC Guideline).  In the CDC Guideline's introduction, CDC stated:

[T]he recommendations in the guideline are voluntary, rather than prescriptive standards. They are based on emerging evidence, including observational studies or randomized clinical trials with

---

[15] https://www.ama-assn.org/system/files/2018-11/i18-refcomm-b-annotated.pdf, pp. 24-5.
[16] https://www.ama-assn.org/system/files/2019-08/a19-bot-reports.pdf, pp. 153-5.

notable limitations.  Clinicians should consider the circumstances and unique needs of each patient when providing care.

Yet, the CDC Guideline goes on to make two recommendations that appear in nearly all the pharmacy, payer and PBM policies:

> [Recommendation] 5. When opioids are started, clinicians should prescribe the lowest effective dosage. Clinicians should use caution when prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and risks when considering increasing dosage to > 50 morphine milligram equivalents (MME)/day, and should avoid increasing dosage to > 90 MME/day or carefully justify a decision to titrate dosage to > 90 MME/day.

> [Recommendation] 6. Long-term opioid use often begins with treatment of acute pain.  When opioids are used for acute pain, clinicians should prescribe the lowest effective dose of immediate-release opioids and should prescribe no greater quantity than needed for the expected duration of pain severe enough to require opioids. Three days or less will often be sufficient; more than seven days will rarely be needed.

**. . .  It is important to note that CDC Guideline Recommendations 5 and 6 were intended guidelines for acute pain episodes, not a hard threshold, and not intended for chronic pain patients**.

\*   \*   \*

At the same time, multiple national pharmacy chains implemented some variation of the CDC Guideline as their policy - a move the AMA warned would occur.

43.     The 2019 Recommendations of the AMA Opioid Task Force include the following:

The Task Force further affirms that some patients with acute or chronic pain can benefit from taking prescription opioid analgesics at doses that may be greater than guidelines or thresholds put forward by federal agencies, health insurance companies, pharmacy chains, pharmacy benefit management companies and other advisory or regulatory bodies. The Task Force continues to urge physicians to make judicious and informed prescribing decisions to reduce the risk of opioid-related harms, but acknowledges that for some patients, opioid therapy, including when prescribed at doses greater than recommended by such entities, may be medically necessary and appropriate. [17]

---

[17]   https://www.end-opioid-epidemic.org/wp-content/uploads/2019/05/2019-AMA-Opioid-Task-Force-Recommendations-FINAL.pdf, p. 3.

44.     The misapplication of the CDC Guideline has been felt in every state.  The problem is so pronounced that in one state, Alaska, the Board of Pharmacy sent a letter dated January 23, 2019 to all Pharmacists, stating:

> The Board of Pharmacy has had an influx of communication concerning patients not able to get controlled substance prescriptions filled for various reasons, even when signs of forgery or fraudulence were not presented.
>
> As a result of the increased "refusals to fill," the board is issuing the following guidance and reminders regarding the practice of pharmacy and dispensing of control substances:
>
> 1. Pharmacists must use reasonable knowledge, skill, and professional judgment when evaluating whether to fill a prescription.  Extreme caution should be used when deciding not to fill a prescription.  A patient who suddenly discontinues a chronic medication may experience negative health consequences;
>
> 2. Part of being a licensed healthcare professional is that you put the patient first.  This means that if a pharmacist has any concern regarding a prescription, they should attempt to have a professional conversation with the practitioner to resolve those concerns and not simply refuse the prescription.  Being a healthcare professional also means that you use your medication expertise during that dialogue in offering advice on potential alternatives, changes in the prescription strength, directions etc.  Simply refusing to fill a prescription without trying to resolve the concern may call into question the knowledge, skill or judgment of the pharmacist and may be deemed unprofessional conduct;
>
> 3. Controlled substance prescriptions are not a "bartering" mechanism.  In other words, a pharmacist should not tell a patient that they have refused to fill a prescription and then explain that if they go to a pain specialist to get the same prescription then they will reconsider filling it.  Again, this may call into question the knowledge, skill or judgment of the pharmacist;
>
> 4. Yes, there is an opioid crisis.  However, this should in no way alter our professional approach to treatment of patients in end-of-life or palliative care situations.  Again, the fundamentals of using our professional judgment, skill and knowledge of treatments plays an integral role in who we are as professionals.  Refusing to fill prescriptions for these patients without a solid medical reason may call into question whether the pharmacist is informed of current professional practice in the treatment of these medical cases.
>
> 5. If a prescription is refused, there should be sound professional reasons for doing so.  Each patient is a unique medical case and should be treated independently as such.  Making blanket decisions regarding dispensing of controlled substances may call into question the motivation of the pharmacist and how they are using their knowledge, skill or judgment to best serve the public.

*   *   *

We all acknowledge that Alaska is in the midst of an opioid crisis. While there are published guidelines and literature to assist all healthcare professionals in up to date approaches and recommendations for medical treatments per diagnosis, do not confuse guidelines with law; they are not the same thing. Pharmacists have an obligation and responsibility under Title 21 Code of Federal Regulations 1306.04(a), and a pharmacist may use professional judgment to refuse filling a prescription. However, how an individual pharmacist approaches that particular situation is unique and can be complex. The Board of Pharmacy does not recommend refusing prescriptions without first trying to resolve your concerns with the prescribing practitioner as the primary member of the healthcare team. Patients may also serve as a basic source of information to understand some aspects of their treatment; do not rule them out in your dialogue. If in doubt, we always recommend partnering with the prescribing practitioner.[18]

45.     On April 24, 2019, the CDC issued a release addressing concerns about the misapplication of its Opioid Prescribing Guideline.[19] In the release, the CDC stated:

In a new commentary external icon in the *New England Journal of Medicine (NEJM)*, authors of the 2016 *CDC Guideline for Prescribing Opioids for Chronic Pain* (Guideline) advise against misapplication of the Guideline that can risk patient health and safety.

CDC commends efforts by healthcare providers and systems, quality improvement organizations, payers, and states to improve opioid prescribing and reduce opioid misuse and overdose. However, some policies and practices that cite the Guideline are inconsistent with, and go beyond, its recommendations. In the NEJM commentary, the authors outline examples of misapplication of the Guideline, and highlight advice from the Guideline that is sometimes overlooked but is critical for safe and effective implementation of the recommendations.

46.     On June 16, 2020, the AMA in response to a recent request by the CDC for comments on the CDC Guideline wrote[20] that many "misapply the CDC Guideline in different ways and have resulted in specific harm to patients" including:

---

[18]   https://www.commerce.alaska.gov/web/portals/5/pub/pha_ControlledSubstanceDispensing_2019.01.pdf.
[19]   https://www.cdc.gov/media/releases/2019/s0424-advises-misapplication-guideline-prescribing-opioids.html.
[20]   https://searchlf.ama-assn.org/undefined/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2020-6-16-Letter-to-Dowell-re-Opioid-Rx-Guideline.pdf.

- CVS Caremark's policy has multiple restrictions, including a 7-day hard threshold for opioid prescribing[21];

47.     The AMA in its June 16, 2020 letter stated:

- Patients experiencing pain need to be treated as individuals, not according to one-size-fits-all algorithms and policies that do not take individual patient's needs into account. Yet, the CDC Guideline also included arbitrary dosage and quantity recommendations that have been consistently misapplied by state legislatures, national pharmacy chains, pharmacy benefit management companies, health insurance companies, and federal agencies. [22]

- Health disparities in pain management and legitimate access to opioid analgesics for pain remain evident, and clinically relevant differences in pain expression and responsiveness based on sex, race, ethnicity, and genetic constitution also exist.

- Patient groups, patients suffering from pain increasingly view themselves as collateral damage in efforts to restrict opioid prescribing decisions via state-based regulations and legislative mandates.

- The CDC has itself acknowledged the CDC Guideline's negative effect on access for patients with legitimate medical needs.

- A 2019 survey from the American Board of Pain Medicine found:[23]

  - 72 percent of pain medicine specialists said that they—or their patients—have been required to reduce the quantity or dose of medication they have prescribed.

  - 92 percent of pain medicine specialists said that they have been required to submit a prior authorization for non-opioid pain care.

- The AMA has heard from many physicians and patients from whom needed pain therapy with opioid analgesics was withheld based on a rationale that the treatment team was following the CDC guidance.

- Patients with sickle cell disease or advanced cancer have been accused of manufacturing acute pain and engaging in drug seeking behavior.

- Patients in hospice or who have cancer that opioid analgesics were denied because the prescribed amount did not comply with the CDC Guideline. These unintended but

---

[21] See CVS Caremark® Opioid Quantity Limits Pharmacy Reference Guide, available at https://www.caremark.com/portal/asset/Opioid _Reference_Guide.pdf.

[22] "The Task Force emphasizes the importance of individualized patient-centered care in the diagnosis and treatment of acute and chronic pain." U.S. Department of Health and Human Services (2019, May). Pain Management Best Practices inter-Agency Task Force Report: Updates, Gaps, Inconsistencies, and Recommendations. Retried from U.S. Department of Health and Human Services website: https://www.hhs.gov/ash/advisorycommittees/pain/reports/index.html.

[23] Second Annual Survey of Pain Medicine Specialists Highlights Continued Plight of Patients with Pain, and Barriers to Providing Multidisciplinary, Non-Opioid Care. American Board of Pain Medicine. Available at http://abpm.org/uploads/files/abpm%20survey%202019-v3.pdf.

predictable consequences add to the stigma, racial, and other biases that these patients already face.

48.   The AMA concluded in its June 16, 2020 letter that:

- Multiple efforts need to be made to remove barriers such as prior authorization, step therapy, quantity limits, high cost-sharing, and coverage limitations on medications to evidence-based care, including ensuring patients have access to the right treatment at the right time.

- The Task Force further affirm that some recognize that patients with acute or chronic pain can benefit from taking prescription opioid analgesics at doses that may be greater than guidelines or thresholds put forward by federal agencies, health insurance plans, pharmacy chains, pharmacy benefit management companies, and other advisory or regulatory bodies.

- The CDC Guideline has harmed many patients[24]--so much so that in 2019, the CDC authors[25] and HHS issued long-overdue … clarifications that states should not use the CDC Guideline to implement an arbitrary threshold:

  Unfortunately, some policies and practices purportedly derived from the guideline have in fact been inconsistent with, and often go beyond, its recommendations.  A consensus panel has highlighted these inconsistencies, which include inflexible application of recommended dosage and duration thresholds and policies that encourage hard limits and abrupt tapering of drug dosages, resulting in sudden opioid discontinuation or dismissal of patients from a physician's practice.  The panel also noted the potential for misapplication of the recommendations to populations outside the scope of the guideline. Such misapplication has been reported for patients with pain associated with cancer, surgical procedures, or acute sickle cell crises.  There have also been reports of misapplication of the guideline's dosage thresholds to opioid agonists for treatment of opioid use disorder.

- Many patients experience pain that is not well controlled, substantially impairs their quality of life and/or functional status, stigmatizes them, and could be managed with more compassionate patient care.

- Treatment decisions for patients with pain must be made on an individualized basis. Opioid therapy should only be used when the benefits outweigh the risks, but there is no question that some patients benefit from opioid therapy including at doses that some may consider "high."

- Some situations exist where patients may have intractable pain and sufficient disability such that functional improvement is not possible, and relief of pain and suffering alone is a supportable primary goal.

---

[24] Beth D Darnall, David Juurlink, Robert D Kerns, Sean Mackey, et al., International Stakeholder Community of Pain Experts and Leaders Call for an Urgent Action on Forced Opioid Tapering, Pain Medicine, Volume 20, Issue 3, March 2019, Pages 429-433, https://dol.org.10.1093/pm/pny228.,

[25] Deborah Dowell, M.D., M.P.H., Tamara Haegerich, Ph.D., Roger Chou, M.D., No Shortcuts to Safer Opioid Prescribing. June 13, 2019. N Engl J Med 2019; 380:2285-2287. DOI: 10.1056/NEJMp1904190.

# VI.

## <u>CVS's ACTIONS</u>

49.     In, or about 2013, CVS implemented limits on opioid prescriptions, which included limits on both dosage and duration.  Upon information and belief, CVS has also implemented the use of internal checklists, data bases and data analytics to screen opioid prescriptions.  While purporting to comply with federal mandates and the CDC Guideline for opioid prescriptions, the CVS policy "blacklists" and discriminated against individuals seeking to fill opioid prescriptions and/or their physician prescribing the medication.

50.     In addition to the foregoing, upon information and belief, CVS has adopted express or implicit requirements that opioid prescriptions not be filled unless accompanied with one or more prescriptions for non-opioid medication.  In the alternative, such requirements are being imposed by individual pharmacists employed by CVS.  There is no medical reason for this requirement, which results in unnecessary increased expenses and costs for Plaintiff and the Class Members.

51.     In addition to the foregoing, upon information and belief, CVS has adopted or will adopt express or implicit requirements that opioid prescriptions not be filled unless and until the person seeking the prescription provide comprehensive medical records which are then reviewed by a person, not licensed to practice medicine, accompanied with one or more prescriptions for non-opioid medication.  In the alternative, such requirements are being imposed by individual pharmacists employed by CVS.  There is no medical reason for this requirement, which results in unnecessary increased expenses and costs for Plaintiff and the Class Members.

52.     Moreover, upon information and belief, CVS has an internal written or informal policy that mandates that pharmacists and other employees are prohibited from informing Plaintiff and the Class Members why they are refusing to fill a valid opioid prescription.

53.     While some may be laudable in concept, the express and implicit policies as adopted and applied by CVS are misguided attempts to reduce illicit access to painkillers by punishing patients who have, and need, legitimate access to such medication.  In practice and application, they

   a. Interfere with the physician-patient relationship between Plaintiff, and the Class Members, and their physicians, effectively engaging in the unauthorized practice of medicine;

   b. Stigmatize and discriminate against Plaintiff, and the Class Members, through no fault of legitimate pain patients themselves or of the doctors caring for them;

   c. Discriminate against Plaintiff, and the Class Members, based on age; and

   d. Ignore the real problems with opioid abuse and foist the responsibility for the epidemic on Plaintiff, and the Class Members.

54.     Further, CVS's express and implicit policies have led to actions taken by its employees and agents, approved by CVS, such as:

   a. Telling customers, including Plaintiff and the Class Members, that they do not have the prescribed medication in stock without checking to see whether the medication is in fact in stock or when the medication will be in stock;

   b. Reducing the stock of certain opioid medication;

   c. Refusing to fill a prescription for opioids unless additional non-opioid prescriptions are presented for filling;

   d. Refusing to fill prescriptions from certain medical providers;

   e. Making subjective determinations about the patient's reasons and need for the prescribed medication; and/or

   f. Focus more on risk management than the needs of the patient.

55.     Proponents of CVS's policies might argue that the limitations and refusal to fill opioid prescriptions does not prevent the patient from getting the prescription filled elsewhere or getting additional prescriptions if the pain persists, but that puts even more of a burden on a patient

who is already unwell and suffering.  Plaintiff  and the Class Members, who are afflicted with complex health conditions, already spend hours a week in doctors' offices and on the phone with insurers and billing departments, have limited access to transportation, and are already hindered by pain and fatigue.

56.     CVS is the largest retail pharmacy chain in the United States, filing more than one billion prescriptions each year in 49 states, the District of Columbia and Puerto Rico and serving 4.5 million customers per day.[26]

57.     CVS's 2019 financial statement reflects total revenue of $256.8 billion, Total Revenue Pharmacy Services of $141,491 billion and that 1 in 3 Americans interact with CVS Health annually.   It further states that it has (i) approximately 9,900 retail locations, (ii) approximately 1,100 walk-in medical clinics, (iii) a leading pharmacy benefits manager with approximately 105 million plan members, (iv) a senior pharmacy care business serving more than one million patients per year and (v) serves an estimated 37 million people through traditional, voluntary and consumer – directed health insurance products and related services.

## VII.

## PLAINTIFF'S ALLEGATIONS

58.     Plaintiff Edith Fuog is 48 years old.  In 2011, she was diagnosed with Stage-1 Breast Cancer, and underwent surgical treatment and reconstruction.  Ms. Fuog subsequently developed Methicillin-resistant Staphylococcus aureus ("MRSA"), an aggressive form of "flesh-eating" bacteria.  The condition worsened and Ms. Fuog developed an even more deadly bacteria, Vancomycin-Resistant Staphylococcus aureus ("VRSA").  In 2011, only 10 other individuals were known to have contracted VRSA.  As a result of contacting VRSA, Ms. Fuog became septic and

---

[26]     https://cvshealth.com/about/facts-and-company-information.

is considered HA-MRSA, having to be quarantined each time she is hospitalized.  In 2014 as a result of a vaccine Ms. Fuog was given for her autoimmune disease, she developed Guillian Barre Syndrome and Parsonage Turner Syndrome, which caused her to become temporarily paralyzed. Ms. Fuog had to re-learn to walk and use her fine motor skills.

59.     In addition to these illnesses, Ms. Fuog suffers from Trigeminal Facial Nerve Neuropathy, arthritis, Hashimotos Thyroid Disease, LUPIS and Complex Regional Pain Syndrome, a form of chronic pain.

60.     In 2014 Ms. Fuog was prescribed Dilaudid 8mg and Fentanyl 50mcg patches. Ms. Fuog's Fentanyl prescription was replaced in 2019 with Morphine ER30mg[27].  At all times, while being prescribed these opioids, Ms. Fuog has been under the care of pain management physicians, and has fully complied with all treatment recommendations, never deviating.

61.     Ms. Fuog began experiencing problems with CVS refusing her prescriptions in 2017.  Ms. Fuog was told by a pharmacist at the CVS Pharmacy at 8700 US Highway 301, Parrish, FL 34219, Store #7937, that it could no longer fill her opioid prescriptions at that location.  When Ms. Fuog inquired as to the reason, she was told that since the 2016 CDC guidelines were released, CVS was changing their policy concerning filing opioid prescriptions.  Ms. Fuog had been filling her opioid prescriptions at that particular CVS location since 2015.  Ms. Fuog filed a complaint with CVS Corporate Headquarters and spoke to a supervisor who told Ms. Fuog there would be a "follow up" and CVS would "let her know what they decided."  Ms. Fuog never heard back from any one at CVS concerning this complaint.  Many times thereafter, Ms. Fuog returned to that particular CVS location, which was close to her residence, only to be told "they did not have [her opioid prescriptions] in stock."

---

[27] The ER stands for the extended release formula of the medication.

62.     Ms. Fuog also visited the CVS location in Sun City, Florida on several occasions to have her opioid prescriptions filled.   There she was initially told CVS would not fill her prescription and on later visits told that the medicine was not in stock.

63.     In June of 2017, Ms. Fuog went to a CVS location in Miami, where the pharmacist refused to fill her opioid prescription, even though two months before CVS had filled her opioid prescriptions.   The pharmacist on duty screamed and yelled at her, in front of other customers, when she questioned the refusal.  Ms. Fuog was told by the pharmacist that the pharmacist wasn't comfortable filling her opioid medications, but the pharmacist never explained the reasons for being "uncomfortable" and suggested that Ms. Fuog  try a CVS pharmacy in Cutler Bay, Florida, where Ms. Fuog had previously lived.   Ms. Fuog filed a complaint with CVS Corporate Headquarters about the incident.  She was subsequently advised that the pharmacist might have committed a HIPPA violation by publicly announcing and rejecting her request for opioid medication and they would look into the matter.  Ms. Fuog followed up several times but was never given any information about her complaint.  As a result of this incident, each month, for days prior to seeking to have her opioid prescription filled, Ms. Fuog suffers from extreme anxiety and sickness in her stomach concerning the treatment she might receive when seeking to have her legitimate opioid prescription filled.

64.     In June of 2018, Ms. Fuog moved to Riverview, Florida and went to a CVS pharmacy near her home (CVS Pharmacy at 5905 Us Highway 301 South Riverview, FL 33569 Store #7225), and explained to the pharmacist her situation, including her disability issues and the fact that she is unable to drive at night.  The pharmacist refused to fill her opioid prescriptions or to discuss the issue with her doctor but advised that the store would be happy to fill all her other medications.  Ms. Fuog told the pharmacist she was being discriminated against her because of her

disability and subsequently filed a complaint about the matter with CVS Corporate Headquarters, which advised her that she would be informed of the results of an investigation into the matter. She has never received any information from CVS covering any such investigation.

65.     Since then, Ms. Fuog has sought to have her opioid prescriptions filled at (i) a CVS pharmacy located inside a Target store at 10150 Bloomingdale Ave Riverview, FL33578, Store #17311 -- also  near her home where the pharmacist advised her that CVS would only fill her non-opioid medications and (ii) a CVS located in Sarasota, Florida where she was advised by the pharmacist  that he could only fill such prescriptions for his "regular customers."  Since 2017, some two dozen other CVS pharmacies all refused to fill her valid prescriptions for opioids on the basis that the medications either were not in stock or that they would not fill her opioids prescriptions for any reason.

## VIII.

## CAUSES OF ACTION

### COUNT I
### Violation of Americans with Disabilities Act
(42 U.S.C. §12101 *et seq*)

66.     Plaintiff repeats, realleges and adopts paragraphs 1 through 65 above as if fully set forth herein.

67.     Title III of the Americans with Disabilities Act ("ADA") provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. §12182(a).

68.     Plaintiff, and the Class Members, are qualified individuals with a "disability" within the meaning of the ADA.  As chronic pain patients who require opioid pain medication, they have "a physical or mental impairment that substantially limits one or more major life activities."

69.     Defendants own, lease and/or operate places of public accommodation within the meaning of the ADA.

70.     On the basis of their disability, Plaintiff, and the Class Members, are discriminated against and deprived of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the places of public accommodation owned, leased and/or operated by Defendants through their adoption, use and application of policies, practices and procedures which, among other things, result in (i) the refusal to dispense opioid medication as prescribed (either in amount or strength) when presented with legitimate prescriptions from patients suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia; (ii) the requirement that Plaintiff, and the Class Members, present and/or purchase additional prescription medication or present other information in order to have her opioid prescriptions filled; (iii) the decision of whether to fill a legitimate opioid prescription being made by someone other than a medical doctor licensed to practice medicine and/or (iv) Plaintiff, and the Class Members, being blacklisted, flagged or otherwise included on a list or database as potentially abusing opioid medication.

71.     Defendants' conduct is ongoing and continuous, and Plaintiff, and the Class Members, have been harmed and continue to be harmed by Defendants' conduct.  Unless Defendants are restrained from continuing their ongoing and continuous course of conduct,

Defendants will continue to violate the ADA and will continue to inflict injury upon Plaintiff and the Class Members.

72.     Plaintiff, and the Class Members, are entitled to injunctive relief and reasonable attorney's fees and costs from Defendants for their violation of the ADA.  Specifically, Plaintiff and the Class Members request this Court:

a. Enjoin Defendants from refusing to dispense opioid medication as prescribed when presented with legitimate prescriptions from patients suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia;

b. Enjoin Defendants from requiring that Plaintiff and the Class Members present prescriptions for, and/or purchase, additional non-opioid prescription medication in order to have their opioid prescriptions filled;

c. Enjoin Defendants from requiring that Plaintiff and the Class Members present additional information or documentation in order to have their opioid prescriptions filled when presented with a valid prescription;

d. Enjoin Defendants from making, and/or allowing to be made, the decision of whether to fill an opioid prescription by someone other than a medical doctor licensed to practice medicine;

e. Order Defendants to develop opioid policies, and train their employees, agents, representatives, contractors and staff on such policies, that distinguish between acute pain patients and patients suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia;

f. Order Defendants to produce and explain their use of all databases and data analytics employed in connection with patients presenting prescriptions for opioid medication;

g. Order Defendants to identify any Class Member who has been blacklisted, flagged or otherwise included on a list or database as potentially abusing opioid medication and clear the Class Member from such list or database;

h. Order Defendants to pay Plaintiff's and the Class' reasonable attorney's fees and costs; and/or

i. Order all other relief to which Plaintiff, and the Class Members, are justly entitled.

## COUNT II
## <u>Violation of Section 504 of the Rehabilitation Act of 1973</u>
### (29 U.S.C. §794)

73.     Plaintiff repeats, realleges and adopts paragraphs 1 through  65 above as if fully set forth herein.

74.     At all times relevant to this action, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, was in full force and effect in the United States.

75.     The Rehabilitation Act forbids programs or activities receiving Federal financial assistance from, among other things, discriminating against otherwise qualified individuals with disabilities.

76.     Plaintiff, and the Class Members, are qualified individuals with disabilities within the meaning of the Rehabilitation Act.   As chronic pain patients who require opioid pain medication, they have "a physical or mental impairment that substantially limits one or more major life activities."

77.     Defendants are subject to the Rehabilitation Act due to the fact that they receive Federal financial assistance from the United States Department of Health and Human Services, including Medicare provider payments from the centers for Medicare/Medicaid Services under Title XVIII, Part D of the Social Security Act, 42 U.S.C. §1395 *et seq*.

78.     Defendants, through their discriminatory practices towards the Plaintiff and the Class Members, based upon their disabilities, has violated and continues to violate the Rehabilitation Act by, *inter alia*, denying disabled individuals, including Plaintiff and the Class Members, the full and equal goods, services, facilities, privileges, advantages or accommodations of their retail pharmacies throughout the United States.

79.     Defendants' conduct has harmed Plaintiff and the Class Members and will continue to harm Plaintiff and the Class Members unless and until Defendants are ordered by this Court to cease the following activities:

    a.  refusing to dispense opioid medication as prescribed when presented with legitimate prescriptions from patients suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia;

    b.  requiring that Plaintiff and the Class Members present prescriptions for, and/or purchase, additional non-opioid prescription medication in order to have their opioid prescriptions filled;

    c.  requiring that Plaintiff and the Class Members present additional information or documentation in order to have their opioid prescriptions filled; and

    d.  making, and/or allowing to be made, the decision of whether to fill an opioid prescription by someone other than a medical doctor licensed to practice medicine.

80.     Defendants' conduct has caused recoverable damages to Plaintiff and the Class Members.

## COUNT III
### Violation of the Anti-Discrimination
### Provisions of the Affordable Care Act
(42 U.S.C. §18116)

81.     Plaintiff repeats, realleges and adopts paragraphs 1 through  65 above as if fully set forth herein.

82.     Section 1557 of the Patient Protection and Affordable Care Act ("ACA") (codified at 42 U.S.C. §18116) was established to combat healthcare discrimination by any health program, healthcare entity, or activity that receives federal funding.  This Act of Congress makes it illegal to discriminate against individuals based upon their race, national origin, gender, age, or disability. Section 1557 of the ACA protects individuals from discrimination in any health program or activity of a recipient of federal financial assistance, such as hospitals, clinics, employers, retail community pharmacies or insurance companies that receive federal money.  Section 1557 specifically extends its discrimination prohibition to entities that receive federal financial

assistance in the form of contracts of insurance, credits, or subsidies, as well as any program or activity administered by an executive agency, including federal health programs like Medicare, Medicaid, and CHiP.

83.     42 U.S.C. §18116, ADA Section 1557, provides in pertinent part as follows:

> (a) . . . an individual shall not, on the ground prohibited under… section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).  The enforcement mechanisms provided for and available under such title VI, title IX, section 504, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

ACA § 1557, 42 U.S.C. §18116(a)

84.     Under 42 U.S.C. §1396r–8(k)(10), "Retail Community Pharmacy" means an independent pharmacy, a chain pharmacy, a supermarket pharmacy, or a mass merchandiser pharmacy that is licensed as a pharmacy by the State and that dispenses medications to the general public at retail prices.

85.     Recipients of Federal financial assistance, such as Defendants, are particularly prohibited from providing "any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program."  See 45 C.F.R. §80.3(a)(ii).  Federal financial assistance has been interpreted and enforced to cover a broad range of programs receiving federal funds.

86.     Defendants are subject to Section 1557 due to the fact that they receive Federal financial assistance from the United States Department of Health and Human Services, including Medicare provider payments from the centers for Medicare/Medicaid Services under Title XVIII, Part D of the Social Security Act, 42 U.S.C. §1395 *et seq*.

87.     Defendants meet the qualifications for being a "health program or activity, any part of which is receiving Federal financial assistance" under Section 1557(a).

88.     Furthermore, Defendants represent that they are subject to Section 1557 of the ACA, and under that law:

> [C]omplies with applicable Federal Civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex. CVS Pharmacy, Inc. does not exclude people or treat them differently because of race, color, national origin, age, **disability** or sex (emphasis added).

(*See* https://www.cvs.com/bizcontent/general/CVS_Pharmacy_Nondiscrimination_Policy.pdf.)

89.     Chronic pain and the underlying medical conditions from which Plaintiff and Class Members suffer has been deemed a "disability" under both federal and state laws.  As chronic pain patients who require opioid pain medication, they have "a physical or mental impairment that substantially limits one or more major life activities."   Accordingly, Plaintiff and the Class Members are considered disabled under both the ADA and Section 504 of the Rehabilitation Act. The discriminatory actions of the Defendants alleged herein were undertaken solely on the basis of Plaintiff's and the Class Members' disabilities.  Due to Defendants' acts of discrimination, *inter alia*, refusing to dispense opioid medication as prescribed when presented with legitimate prescriptions from patients suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia; requiring that Plaintiff and the Class Members present prescriptions for, and/or purchase, additional non-opioid prescription medication in order to have their opioid prescriptions filled; requiring that Plaintiff and the Class Members present additional information or documentation in order to have their opioid prescriptions filled; and making, and/or allowing to be made, the decision of whether to fill an opioid prescription by someone other than a medical doctor licensed to practice medicine, Plaintiff and the Class Members have not been provided meaningful access to their life-sustaining medications.

90.     Defendants' actions have violated and continue to violate Section 1557(a) of the Affordable Care Act by intentionally causing Plaintiff and the Class Members to "be excluded from participation in, be denied the benefits or, or be subjected to discrimination under any health program or activity, any part of which is receiving Federal financial assistance" based on disability which is a prohibited ground of discrimination under Title IX.

91.     Plaintiff and the Class Members have suffered damages by this violation of Section 1557(a) in the denial of access to necessary medical care and/or services including, though not limited to, the filing and receipt of their valid opioid prescription medication.

92.     Plaintiff and the Class Members request Declaratory and injunctive relief to protect their rights under Section 1557(a), and to remedy the Defendants' continued violation of Section 1557(a).

93.     Plaintiff and the Class Members have been harmed as a result of Defendants' conduct and are entitled to compensatory damages, attorneys' fees and costs, and all other additional appropriate relief as may be available under this cause of action and the applicable law.

## IX.

## <u>JURY DEMAND</u>

95. Plaintiff and the Class Members request a jury trial on all issues triable by a jury.

## X.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff, on behalf of herself and the members of the class she represents, prays for:

1.  An Order certifying the class proposed by Plaintiff, naming Plaintiff as class representative, and appointing her counsel as class counsel;

2.  A declaratory judgment that Defendants are in violation of the ADA, the ACA and the Rehabilitation Act of 1973;

3.  Injunctive relief as prayed for herein;

4.  An award of compensatory damages, pursuant to 42 U.S.C. §18116, to Plaintiff and the Class Members in an amount determined by the jury that would fully compensate them for the injuries by Defendants' discriminatory conduct;

5.  An award of punitive damages, pursuant to 42 U.S.C. §18116, to Plaintiff and the Class Members in an amount determined by the jury, but no less than three times the amount of actual damages, that would punish Defendants for the intentional, willful, wanton, and reckless discriminatory behavior;

6.  Payment of costs of suit;

7.  Payment of reasonable attorneys' fees; and,

8.  All other relief to which Plaintiff, and the class she represents, are justly entitled as a matter of law or equity.

Respectfully Submitted,

By their Attorneys,

/s/ Stephen M. Prignano
Stephen M. Prignano, Esquire (#3649)
MCINTYRE TATE LLP
50 Park Row West, Suite 109
Providence, Rhode Island 02903
(401) 351-7700
(401) 331-6095 (Fax)
SPrignano@McIntyreTate.com

Attorneys for Plaintiff Edith Fuog and all those similarly situated

**OF COUNSEL** *(Pro Hac Vice Applications to be filed)*:

Scott D. Hirsch (scott@scotthirschlawgroup.com)
SCOTT HIRSCH LAW GROUP
7301 W Palmetto Park Rd #207A
Boca Raton, FL 33433
Telephone:  (561) 569-7062

Joseph A. Bruno (jbruno@brunobrunolaw.com)
BRUNO & BRUNO
855 Baronne St
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

Robert Redfearn (Robertr@SPSR-law.com)
Robert L. Redfearn, Jr. (Robertjr@SPSR-law.com)
30th Floor, Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-3000
Telephone:  (504) 569-2030
Facsimile:  (504) 569-2999

Mark Kepple (mkepple@baileywyant.com)
1219 Chapline St.
Wheeling, W. Va.  26003
Telephone: (304) 233-3100
Facsimile: (304) 343-3133

Thomas D. Haklar (thaklar@haklarlaw.com)
LAW OFFICE OF THOMAS D. HAKLAR
320 Encinitas Bold., Suite A
Encinitas, CA 92024
Telephone:  (858) 481-5454
Facsimile: ( 858) 720-9797

Ted Huge (Ted@harrisandhuge.com)
HARRIS & HUGE, LLC
180 Spring St.
Charleston, SC 29403
Telephone:  (843) 805-8031
Facsimile:  (843) 636-3375