UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **EDITH FUOG,** individually and on behalf of those similarly situated, | * * * | |
| Plaintiff, | * * | |
| vs. | * * | CLASS ACTION |
| | * | |
| **CVS PHARMACY, INC.,** **CAREMARK PHC, LLC**, | * * * | |
| Defendants. | * * | Case No. 1:20-cv-00337 |
| | * | |
| * * * * * * * * * * * * * * * | | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff Edith Fuog, by and through her undersigned counsel, brings this class action lawsuit for violations of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq., the Rehabilitation Act of 1973, 29 U.S.C. §701, et seq., and the Affordable Care Act, 42 U.S.C. §18116, *et seq.* In support, Plaintiff alleges the following:

## I.

## NATURE OF THE ACTION

1.      This is a putative class action brought through Fed. R. Civ. P. 23.  It is brought by an individual on her own behalf and on behalf of all others similarly situated, against one of the country's largest pharmacy chains owned, operated and/or controlled by CVS Pharmacy, Inc. and/or Caremark PHC, LLC (collectively "CVS" or "Defendants").

2.      This class action seeks to recover from CVS damages and injunctive relief for its corporate wide discriminatory practices in refusing to fill, without a legitimate basis, valid and legal prescriptions for opioid medication of Plaintiff and the Class Members, protected individuals under federal law.

3.      More specifically, Plaintiff alleges, and intends to prove, that persons with prescriptions exceeding the dose and duration thresholds set forth in the Guideline for Prescribing Opioids issued by the Centers for Disease Control ("CDC") on or about March 15, 2016  (the "CDC Guideline" or "Guideline") are not given such prescriptions by their treating physicians unless they suffer intractable pain from underlying conditions which render them disabled within the meaning of federal law, a correlation recognized by several studies as set forth herein. Alternately, the majority of such persons are disabled within the meaning of federal law.

4.      The initial, and primary, responsibility for issuing a valid prescription is with the treating physician.  Before prescribing opioids for any patient, the treating physician conducts and documents a complete medical history & physical examination of the patient.  The examination includes a review and analysis of the condition for which the treatment is sought and its cause, the nature and intensity of the patient's pain, current and past treatments for the condition and pain, underlying or coexisting diseases or conditions and a review of medical records and previous diagnostic studies.  The physician then develops a treatment plan and treatment goals, including curing, if possible, the underlying medical condition, decreasing pain and increasing function, improving pain-associated effects (e.g., sleeping issues, depression, anxiety, etc.), screen for treatment side effects, and avoiding unnecessary or excessive medication.   The plan is evaluated and updated throughout the course of treatment so that it continues to be appropriate and realistic.

5.      When the prescription is presented to a pharmacist, the pharmacist is to ensure that the prescription is not a forgery and was issued by a duly licensed and DEA registered prescriber. If the pharmacist has questions about the medical purpose of the prescription, the pharmacist is to consult with the prescriber to confirm the reason for the prescription and that it was intended to be issued to the person presenting the prescription for the drug, dose and duration stated in the

prescription.  The pharmacist, however, may not substitute his or her opinion for the medical judgment of the doctor and re-diagnose the patient.

6.      However, patients, such as Plaintiff, presenting these prescriptions at pharmacies owned, controlled and/or operated by CVS are profiled as drug abusers.  Rather than take the steps necessary to confirm the validity of the prescriptions, CVS, through its policy, practice, procedures and training, encourage and incentivize its pharmacists to not fill the prescriptions in contrast to the way patients with non-opioid prescriptions or opioid prescriptions which do not exceed the CDC Guideline dose and duration thresholds are treated.  As such, CVS discriminated against Plaintiff, and others similarly situated, on the basis of disability and deny them meaningful access to their pharmacy goods and services.

## II.

## THE PARTIES

7.      Plaintiff Edith Fuog is an individual residing in Riverview, Florida. Ms. Fuog suffers from numerous diseases resulting in her suffering from chronic pain.

8.      Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.  It can be served through its registered agent for process, CT Corporation, System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, R.I. 02914.

9.      Defendant Caremark PHC, LLC is a Delaware limited liability company with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.  It can be served through its registered agent for process, CT Corporation, System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, R.I. 02914.

10.     Defendants are jointly referred to as "CVS" or "Defendants."

11.     CVS, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor and operates retail stores throughout the United States, including in Rhode Island, that dispense and sell prescription medicines, including opioids.  Caremark PHC provides prescription benefit management services.

### III.

### JURISDICTION AND VENUE

12.     This Court maintains jurisdiction over the parties to this action.  Defendants are citizens of the State of Rhode Island, with their principal place of business located within this District.  The members of the Class are resident citizens of Rhode Island as well as other states where Defendants conduct business.

13.     This Court has subject matter jurisdiction over this action.  Federal question jurisdiction exists based on the assertion of claims for violations of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq., the Rehabilitation Act of 1973, 29 U.S.C. §701, et seq., and the Affordable Care Act, 42 U.S.C. §18116, *et seq*.

14.     This Court also has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). CAFA's requirements are satisfied in that (1) the members of the Class exceed 100; (2) the citizenship of at least one proposed Class member is different from that of the Defendants; and (3) the matter in controversy, after aggregating the claims of the proposed Class Members, exceeds $5,000,000.00, exclusive of interest and costs.

15.     This Court has general diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between the named Plaintiff and the Defendants.

16.     Additionally, this Court has jurisdiction pursuant to 28 U.S.C. §1343(a)(4) in that

this action seeks to recover damages or to secure equitable relief under an Act of Congress providing for the protection of the Plaintiff's and the Class Members' civil rights.

17.     Venue is proper in this District under 28 U.S.C. §1391.

## IV.

## <u>CLASS ACTION ALLEGATIONS</u>

18.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure and is a member of, and seeks to represent, a class of persons defined as:

> All persons residing in the United States suffering from a disabling medical condition for which they were and are issued valid prescriptions for opioid medication exceeding 90 MME (Morphine Milligram Equivalent) and 7 days duration by a licensed medical provider as part of medical treatment during the period of March 15, 2016 through the present (collectively referred to as the "Class").

Excluded from the Class are:

a.  The officers and directors of any Defendant and their immediate family;
b.  Any judge or judicial personnel assigned to this case and their immediate family;
c.  Any legal representative, successor or assignee of any excluded person or entity.

### <u>Numerosity of the Class (Fed. R. Civ. P. 23(a)(1))</u>

19.     The members of the national putative class are so numerous that joinder of all members is impracticable.  Plaintiff estimates the number of Class Members to be in the tens of thousands or more similarly situated individuals nationwide.

20.     The Class Members are identifiable using methods of assessment and/or records maintained in the ordinary course of business by the Defendants.

21.     Notice may be provided to the Class Members by publication, first-class mail and/or other means.

**Commonality (Fed. R. Civ. P. 23(a)(2))**

22.     Common questions of law and fact exist as to all Class Members and predominate over questions affecting individual Class Members.  Among the questions of law and fact common to the putative class are:

a. Whether Defendants improperly refused to fill the Class's legitimate prescriptions for opioid medication;

b. Whether Defendants implemented express and/or implicit state-wide and/or national policies regarding the filling of opioid prescriptions which misinterpret and/or misapply applicable guidelines and laws;

c. Whether Defendants implemented or created state-wide and/or national databases and/or used data analytical tools as part of determining whether to fill the Class's opioid prescriptions;

d. Whether Defendants "profiled" persons presenting prescriptions for opioid pain medication on a state-wide and/or national basis;

e. Whether Defendants' express and/or implicit policies regarding the filling of prescriptions for opioid medication interfere with the Class's relationship with their physicians;

f. Whether Defendants' express and/or implicit policies regarding the filling of prescriptions for opioid medication impose unnecessary requirements that increase the cost and expense to the Class;

g. Whether Defendants' express and/or implicit policies, resulting in the refusal to fill the Class's opioid prescriptions violate the ADA and/or Section 504 of the Rehabilitation Act; and

h. Whether Defendants' express and/or implicit policies, resulting in the refusal to fill Plaintiffs opioid prescriptions violate the Anti-Discrimination provisions of the ACA.

23.     Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

**Typicality (Fed. R. Civ. P. 23(a)(3))**

24.      The claims of the representative Plaintiff are typical of the claims of the Class. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all members of the Class.  Plaintiff has been damaged by the same wrongful conduct by Defendants and suffered injuries similar in kind and degree to the injuries suffered by all putative class members.  Plaintiff makes the same claims and seeks the same relief for herself and for all Class Members.

**Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**

25.      Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex class actions. Neither Plaintiff nor her Counsel have interests adverse to those of the Class.

**Superiority of Class Action (Fed. R. Civ. P. 23(b)(2))**

26.      Absent class treatment, Plaintiff and Class Members will continue to suffer harm as a result of Defendants' unlawful and wrongful conduct. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Without a class action, individual Class Members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights.  Because of the ratio of the economic value of the individual Class Members' claims in comparison to the high litigation costs in complex cases such as this, few could likely seek their rightful legal recourse.  Absent a class action, Class Members will continue to incur harm without remedy.

**Superiority of Class Action (Fed.  R.  Civ.  P.  23(b)(3))**

27.      Proceeding on a class wide basis is a superior method for the fair and efficient adjudication of the controversy because class treatment will permit a large number of similarly

situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort, judicial resources,  and expenses that individual actions would entail.  Class treatment will allow Class Members to seek redress for injuries that would not be practical to pursue individually because the damages suffered by the individual members of the putative class is relatively small compared to the burden and expense of individual litigation of their claims against the Defendants. These benefits substantially outweigh any difficulties that could arise out of class treatment.

28.      Moreover, prosecuting separate actions by individual Class Members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the Defendants; and/or

(B) adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

29.       Plaintiff knows of no difficulty that will arise in the management of this litigation that would preclude its maintenance as a class action.

30.      Finally, Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## V.

## BACKGROUND

31.      Following publicity about a national problem with opioid abuse, numerous states, cities and municipalities filed lawsuits against manufacturers, wholesalers and dispensers of opioids alleging that aggressive and misleading marketing campaigns which began in the 1980s and 1990s created an "enormous untapped market" of patients with "everyday aches and pains"

for opioid medication.  These suits, and enforcement actions by agencies, such as the Department of Justice and Drug Enforcement Agency, also alleged that various pharmacy defendants had inadequate policies and procedures in place to ensure that prescriptions they filled for opioids were valid prescriptions for legitimate medical purposes.

32.     In response, the pharmacy companies began an overbroad campaign to protect themselves against potential liability.  To this end, pharmacy companies, including Defendants, swung the pendulum too far in the other direction and implemented policies, practices and procedures arbitrarily restricting access to opioid medication dispensed by their retail pharmacy outlets, even when presented with valid prescriptions.   These policies go too far and are deliberately indifferent to the medical needs and rights of patients with appropriate and valid prescriptions for such medication.  Many disabled innocent and legitimate patients have been denied access to necessary medication, arbitrarily profiled and treated as criminals and/or drug addicts and forced to incur unnecessary additional expenses to obtain opioid medication prescribed for legitimate medical needs as determined by their treating medical providers, all while suffering from debilitating pain.

33.     In 2010, the CDC began developing a guideline to provide "better clinician guidance on opioid prescribing" and on or about March 15, 2016 issued its Guideline for Prescribing Opioids for Chronic Pain.  The CDC Guideline was intended as a "recommendation" for patients *starting* opioid therapy and specifically did not apply to cancer treatment, palliative care, and end-of-life care.  Additionally, the Guideline was directed only to clinicians and not pharmacists, as the Guideline dealt with the scope of treatment for the underlying medical condition; something for which pharmacists have no training.   Of particular relevance are recommendations 5 and 6, which provide:

5.   When opioids are started, clinicians should prescribe the lowest effective dosage.  Clinicians should use caution when prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and risks when considering increasing dosage to ≥50 morphine milligram equivalents (MME)/day, and should avoid increasing dosage to ≥90 MME/day or carefully justify a decision to titrate dosage to ≥90 MME/day.

6.   Long-term opioid use often begins with treatment of acute pain.  When opioids are used for acute pain, clinicians should prescribe the lowest effective dose of immediate-release opioids and should prescribe no greater quantity than needed for the expected duration of pain severe enough to require opioids.  Three days or less will often be sufficient; more than seven days will rarely be needed.[1]

34.     Instead of understanding and developing policies that took into consideration the clear distinction the CDC was making for the benefit of physicians between acute and long-term pain, Defendants implemented policies and procedures that adopted and used the CDC Guideline dosage and duration thresholds as fixed limits and a means to refuse to fill legitimate opioid prescriptions as written.  The result is twofold: (1) Defendants are injecting themselves into the doctor-patient relationship and are now de facto practicing medicine, and (2) Edith Fuog and similarly situated individuals of the Class are "profiled" and subjected to discriminatory practices which restrict their access to lawfully prescribed medication they need to survive.  The actions of the Defendants and other pharmacies, utilizing the guise of a legitimate gatekeeper function, is nothing more than pretextual discriminatory practices which have burdened the process of filling valid prescriptions for opioids to such an extreme that Edith Fuog and other similarly situated disabled individuals are denied meaningful access to their rightful medical treatment.

35.     Seeing the unnecessary pain being thrust upon disabled individuals suffering from high impact chronic pain, the American Medical Association ("AMA") recognized that pharmacies were inappropriately using the CDC Guideline.  At its 2018 Annual Meeting, the AMA House of Delegates referred the following to its Board of Trustees:

---

[1]     https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

[T]hat our AMA actively continue to communicate and engage with the nation's largest pharmacy chains, pharmacy benefit managers, National Association of Insurance Commissioners, Federation of State Medical Boards, and National Association of Boards of Pharmacy in opposition to communications being sent to physicians that include a blanket proscription against filing prescriptions for opioids that exceed numerical thresholds without taking into account the diagnosis and previous response to treatment for a patient and any clinical nuances that would support such prescribing as falling within standards of good quality patient care.[2]

36.    In 2019, the AMA Board of Trustees issued Report 22-A-19[3] in response, which

provides in relevant part:

Health insurance companies, national pharmacy chains and pharmacy benefit management companies (PBMs) all have - to varying degrees - implemented their own policies governing physician prescribing of controlled substances as well as patients' abilities to have a controlled substance prescription dispensed to them. The result of this type of quasi-regulation is incredibly difficult to quantify on a large-scale basis due to the lack of transparency in the public sphere, but the AMA and many medical societies continue to receive concerns from physicians and patients as to the disruptive nature of health plan, pharmacy chain or PBM interference in the patient-physician relationship.

*    *    *

. . . [N]ational pharmacy chains, health insurance companies and PBMs have implemented their own restrictive opioid prescribing policies. This report will not detail every iteration and difference between the policies except to say that most of the policies are some variation of the "CDC Guideline for Prescribing Opioids for Chronic Pain - United States, 2016" (the CDC Guideline). In the CDC Guideline's introduction, CDC stated:

[T]he recommendations in the guideline are voluntary, rather than prescriptive standards. They are based on emerging evidence, including observational studies or randomized clinical trials with notable limitations. Clinicians should consider the circumstances and unique needs of each patient when providing care.

Yet, the CDC Guideline goes on to make two recommendations that appear in nearly all the pharmacy, payer and PBM policies:

[Recommendation] 5. When opioids are started, clinicians should prescribe the lowest effective dosage. Clinicians should use caution when prescribing opioids at any dosage, should carefully reassess

---

[2]    https://www.ama-assn.org/system/files/2018-11/i18-refcomm-b-annotated.pdf, pp. 24-5.
[3]    https://www.ama-assn.org/system/files/2019-08/a19-bot-reports.pdf, pp. 153-5.

evidence of individual benefits and risks when considering increasing dosage to > 50 morphine milligram equivalents (MME)/day, and should avoid increasing dosage to > 90 MME/day or carefully justify a decision to titrate dosage to > 90 MME/day.

[Recommendation] 6. Long-term opioid use often begins with treatment of acute pain. When opioids are used for acute pain, clinicians should prescribe the lowest effective dose of immediate-release opioids and should prescribe no greater quantity than needed for the expected duration of pain severe enough to require opioids. Three days or less will often be sufficient; more than seven days will rarely be needed.

. . . **It is important to note that CDC Guideline Recommendations 5 and 6 were intended guidelines for acute pain episodes, not a hard threshold, and not intended for chronic pain patients**.

\*   \*   \*

At the same time, multiple national pharmacy chains implemented some variation of the CDC Guideline as their policy - a move the AMA warned would occur.

37.     In addition, most of the CDC Guideline is based on "type 4 evidence," which the CDC defined as, "clinical experience and observations, observational studies with important limitations, or randomized clinical trials with several major limitations."[4]   The improper implementation of the CDC Guideline by the Defendants and other pharmacies is an overcorrection to a problem they are alleged to have helped create and has been felt in every state. The problem is so pronounced that in one state, Alaska, the Board of Pharmacy sent a letter dated January 23, 2019 to all Pharmacists, stating:

The Board of Pharmacy has had an influx of communication concerning patients not able to get controlled substance prescriptions filled for various reasons, even when signs of forgery or fraudulence were not presented.

As a result of the increased "refusals to fill," the board is issuing the following guidance and reminders regarding the practice of pharmacy and dispensing of control substances:

1. Pharmacists must use reasonable knowledge, skill, and professional judgment when evaluating whether to fill a prescription. Extreme caution should be used when

---

[4]   https://www.cato.org/blog/lawmakers-really-want-follow-science-they-will-repeal-codified-opioid-guidelines.

deciding not to fill a prescription.  A patient who suddenly discontinues a chronic medication may experience negative health consequences;

2.  Part of being a licensed healthcare professional is that you put the patient first.  This means that if a pharmacist has any concern regarding a prescription, they should attempt to have a professional conversation with the practitioner to resolve those concerns and not simply refuse the prescription.  Being a healthcare professional also means that you use your medication expertise during that dialogue in offering advice on potential alternatives, changes in the prescription strength, directions etc. Simply refusing to fill a prescription without trying to resolve the concern may call into question the knowledge, skill or judgment of the pharmacist and may be deemed unprofessional conduct;

3.  Controlled substance prescriptions are not a "bartering" mechanism.  In other words, a pharmacist should not tell a patient that they have refused to fill a prescription and then explain that if they go to a pain specialist to get the same prescription then they will reconsider filling it.  Again, this may call into question the knowledge, skill or judgment of the pharmacist;

4.  Yes, there is an opioid crisis.  However, this should in no way alter our professional approach to treatment of patients in end-of-life or palliative care situations.  Again, the fundamentals of using our professional judgment, skill and knowledge of treatments plays an integral role in who we are as professionals.  Refusing to fill prescriptions for these patients without a solid medical reason may call into question whether the pharmacist is informed of current professional practice in the treatment of these medical cases.

5.  If a prescription is refused, there should be sound professional reasons for doing so. Each patient is a unique medical case and should be treated independently as such. Making blanket decisions regarding dispensing of controlled substances may call into question the motivation of the pharmacist and how they are using their knowledge, skill or judgment to best serve the public. [5]

38.     In 2016, a Pain Management Best Practices Inter-Agency Task Force was established by the U.S. Department of Health and Human Services to address gaps or inconsistencies in managing chronic and acute pain.  The 29-member Task Force included federal agency representatives as well as nonfederal experts and representatives from a broad group of stakeholders.  On May 9, 2019, it issued its Report.[6]  Its findings included the following:

The recent advent of retail pharmacies limiting the duration of prescriptions, making unrequested changes to dosages, or placing barriers to obtaining properly prescribed pain medications has had the unintended consequence of limiting access

---

[5]  https://www.commerce.alaska.gov/web/portals/5/pub/pha_ControlledSubstanceDispensing_2019.01.pdf.
[6]  https://www.hhs.gov/sites/default/files/pmtf-final-report-2019-05-23.pdf.

to optimal pain care. Without such access, many patients face significant medical complications, prolonged suffering, and increased risk of psychiatric conditions. (§3.4, pp. 62-3)

\* \* \*

Our report documented widespread misinterpretation of the CDC Guideline — specifically, the recommendation regarding the 90 morphine milligram equivalents (MME) dose. . . . Instances have been reported where the CDC Guideline was misapplied to the palliative care and cancer populations with pain and to providers who care for these patient populations.  (§4, pp. 69)

\* \* \*

The CDC Guideline recommends that opioids prescribed for acute pain be limited to three or fewer days and that more than a seven-day supply is rarely necessary. Various health insurance plans, retail pharmacies, and local and state governments are implementing the CDC Guideline as policy, limiting the number of days a patient can receive prescription opioids even when the seriousness of the injury or surgery may require opioids for adequate pain management for a longer period. (§4, p. 70)

\* \* \*

For clarity, the CDC Guideline recommendation #6 refers to acute pain that is non-surgical, non-traumatic pain.  (§4, p. 72)

39.     On April 24, 2019, the CDC issued a release addressing concerns about the misapplication of its Opioid Prescribing Guideline.[7]  In the release, the CDC stated:

In a new commentary external icon in the *New England Journal of Medicine (NEJM)*, authors of the 2016 *CDC Guideline for Prescribing Opioids for Chronic Pain* (Guideline) advise against misapplication of the Guideline that can risk patient health and safety.

. .   However, some policies and practices that cite the Guideline are inconsistent with, and go beyond, its recommendations.  In the NEJM commentary, the authors outline examples of misapplication of the Guideline, and highlight advice from the Guideline that is sometimes overlooked but is critical for safe and effective implementation of the recommendations.

40.     A June 25, 2019 letter from the National Council on Independent Living written to Congress[8] warned:

The CDC guideline contains dosage guidance to assist doctors in starting a new opioid individual ranging from the equivalent of 50 to 90 milligrams of morphine

---

[7]    https://www.cdc.gov/media/releases/2019/s0424-advises-misapplication-guideline-prescribing-opioids.html.
[8]    https://www.ncil.org/wp-content/uploads/2019/06/6-25-19-Chronic-Pain-Sign-On-Letter.pdf.

a day.  This recommendation is also based on low quality evidence (evidence quality 3).

Yet this dosage guidance has taken on a life of its own, becoming, as the CDC recently recognized, a sort of benchmark or proxy for safe prescribing.  It has been translated as a de facto limit into pharmacy and payer policies and has been used to flag patients as over-utilizers and physicians as over-prescribers, without any consideration of the context of an individual's disease or the population of individuals a physician treats.

As CDC Director Redfield recently clarified, this provision was never intended to apply to people currently taking opioids—as the implications of altering medication for current patients are quite different.  For current patients, the Director makes clear, the only relevant question is whether the benefits exceed the risks of the medication.

The final report released by the Interagency Task Force also criticized the strict use of dosage thresholds as unscientific and potentially harmful.  Nevertheless, these numbers are now used in risk scoring algorithms by payers, hospitals, pharmacies and law enforcement agencies, often in ways that are nontransparent.  Higher-than-average dosage may automatically generate a "high-risk" score, even for individuals who have had years of successful long-term therapy and who exhibit no other risk factors and may lead to the abrupt and inappropriate denial of medication.

*   *   *

## OVERREACH TO UNINTENDED POPULATIONS

Another unintended consequence of misapplications of the guideline has been overreach to individuals who were never intended to be covered, such as people with cancer or sickle cell disease who were expressly exempt from the CDC guideline but have experienced serious barriers to receiving medication in the current policy environment.  Similarly, some policies focused on acute pain have exempted people with chronic pain, but these exemptions too have proven insufficient to protect access to medication.

41.     On June 16, 2020, the AMA in response to a request by the CDC for comments on the CDC Guideline wrote[9] that many "misapply the CDC Guideline in different ways and have resulted in specific harm to patients," including the CVS's Opioid Dispensing Policy.

---

[9]     https://searchlf.ama-assn.org/undefined/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2020-6-16-Letter-to-Dowell-re-Opioid-Rx-Guideline.pdf.

42.     The AMA in its June 16, 2020 letter stated:

- Patients experiencing pain need to be treated as individuals, not according to one-size-fits-all algorithms and policies that do not take individual patient's needs into account.  Yet, the CDC Guideline also included arbitrary dosage and quantity recommendations that have been consistently misapplied by state legislatures, national pharmacy chains, pharmacy benefit management companies, health insurance companies, and federal agencies. [10]

- The CDC has itself acknowledged the CDC Guideline's negative effect on access for patients with legitimate medical needs.

- A 2019 survey from the American Board of Pain Medicine found:[11]

    - 72 percent of pain medicine specialists said that they—or their patients— have been required to reduce the quantity or dose of medication they have prescribed.

- The AMA has heard from many physicians and patients from whom needed pain therapy with opioid analgesics was withheld based on a rationale that the treatment team was following the CDC guidance.

- Patients with sickle cell disease or advanced cancer have been accused of manufacturing acute pain and engaging in drug seeking behavior.

- Patients in hospice or who have cancer that opioid analgesics were denied because the prescribed amount did not comply with the CDC Guideline.  These unintended but predictable consequences add to the stigma, racial, and other biases that these patients already face.

43. The AMA concluded in its June 16, 2020 letter that:

- The Task Force further affirms that some recognize that patients with acute or chronic pain can benefit from taking prescription opioid analgesics at doses that may be greater than guidelines or thresholds put forward by federal agencies, health insurance plans, pharmacy chains, pharmacy benefit management companies, and other advisory or regulatory bodies.

---

[10]   "The Task Force emphasizes the importance of individualized patient-centered care in the diagnosis and treatment of acute and chronic pain." U.S. Department of Health and Human Services (2019, May). Pain Management Best Practices inter-Agency Task Force Report: Updates, Gaps, Inconsistencies, and Recommendations.  Retried from U.S. Department of Health and Human Services website: https://www.hhs.gov/ash/advisorycommittees/pain/reports/index.html.

[11]   Second Annual Survey of Pain Medicine Specialists Highlights Continued Plight of Patients with Pain, and Barriers to Providing Multidisciplinary, Non-Opioid Care. American Board of Pain Medicine. Available at http://abpm.org/uploads/files/abpm%20survey%202019-v3.pdf.

- The CDC Guideline has harmed many patients[12]--so much so that in 2019, the CDC authors[13] and HHS issued long-overdue … clarifications that states should not use the CDC Guideline to implement an arbitrary threshold.

- Unfortunately, some policies and practices purportedly derived from the guideline have in fact been inconsistent with, and often go beyond, its recommendations.  A consensus panel has highlighted these inconsistencies, which include inflexible application of recommended dosage and duration thresholds and policies that encourage hard limits and abrupt tapering of drug dosages, resulting in sudden opioid discontinuation or dismissal of patients from a physician's practice.  The panel also noted the potential for misapplication of the recommendations to populations outside the scope of the guideline.  Such misapplication has been reported for patients with pain associated with cancer, surgical procedures, or acute sickle cell crises.  There have also been reports of misapplication of the guideline's dosage thresholds to opioid agonists for treatment of opioid use disorder.

## VI.

## <u>DEFENDANTS' OPIOID DISPENSING POLICY</u>

44.     Following the publication of the CDC Guideline on or about March 15, 2016,

CVS  changed its policy concerning filing opioid prescriptions.  Publicly, CVS announced that

the Policy would include:

- Seven-day supply limits for acute pain where appropriate;
- Morphine milligram equivalent (MME) quantity limits; and
- Immediate release (IR) before extended release (ER) step therapy.

CVS also made clear that its Policy "aligns with the Centers for Disease Control and Prevention

(CDC) guidelines."[14]

45.     The Policy was applicable "enterprise-wide," meaning to CVS's retail pharmacies

and CVS Caremark's pharmacy benefits manager program, to "leverage the capabilities of CVS

---

[12]    Beth D Darnall, David Juurlink, Robert D Kerns, Sean Mackey, et al., International Stakeholder Community of Pain Experts and Leaders Call for an Urgent Action on Forced Opioid Tapering, Pain Medicine, Volume 20, Issue 3, March 2019, Pages 429-433, https://dol.org.10.1093/pm/pny228.

[13]    Deborah Dowell, M.D., M.P.H., Tamara Haegerich, Ph.D., Roger Chou, M.D., No Shortcuts to Safer Opioid Prescribing. June 13, 2019. N Engl J Med 2019; 380:2285-2287. DOI: 10.1056/NEJMp1904190.

[14]    See https://cvshealth.com/news-and-insights/articles/utilization-management-strategies-to-address-the-opioid-crisis.

Health's pharmacy benefit manager (PBM), CVS Caremark, which covers nearly 90 million plan members, and the CVS Pharmacy retail presence in nearly 10,000 communities across the country."[15]

46.     Although CVS did not publicly provide all details of its Policy, upon information and belief, CVS's Policy incorporated the CDC Guideline's 90 MME dosage and 7-day duration thresholds as hard and fast limits and misapplied the CDC Guideline.  More specifically, although the Policy language appears benign, when patients present prescriptions for opioid medication exceeding both the CDC Guideline's 90 MME dosage and 7-day thresholds, CVS, through its Opioid Dispensing Policy, and related Practices, Procedures and Training, incentivizes, pressures and/or instructs, expressly or implicitly, its pharmacists to not fill such prescriptions and/or fill them at lesser amounts which do not exceed the CDC Guideline dose and duration thresholds, treating those thresholds as hard and fast limits.  Accordingly, CVS's pharmacists will obtain information about the patient's diagnosis, ICD codes, details of the patient's treatment plan, the expected length of treatment and whether previous medications were tried and failed in order to use this information to, in effect, "re-diagnose" the patient and his or her treatment and potentially "blacklist" individuals seeking to fill opioid prescriptions and/or their physicians prescribing the medication.

47.     CVS has made the decision to continue filling and selling opioid prescriptions. Although its Policy does not necessarily mean that prescriptions exceeding the CDC Guideline dosage and duration thresholds will never be filled, CVS, through its Opioid Dispensing Policy, Practices, Procedures and Training, actively discourages and burdens the process of filling valid

---

[15]    See              https://www.cusd.com/Downloads/v2-CVS-Health-Enhanced-Opioid-Utilization-Management-03_06_18.pdf.

prescriptions exceeding the Guideline dosage and duration thresholds, either at all or as written. Upon information and belief, CVS's pharmacists are made aware through their managers and their training that by filling such prescriptions, the pharmacists are susceptible to being fired and risk being left on their own in any civil or criminal investigation relating to the filling of the prescription.

48.     Nationwide, following the issuance of the CDC Guideline in 2016, customers, such as Plaintiff, presenting opioid prescriptions exceeding the CDC Guideline dose and duration thresholds at CVS noticed difficulty and/or an inability in getting their prescriptions filled as written. The AMA passed resolutions and issued a letter noting that the CDC Guideline dose and duration thresholds was being applied improperly by pharmacies, specifically mentioning CVS. This was also noted by the Pain Management Task Force in its Pain Management Best Practices Report. The CDC itself issued a press release specifically warning against the misuse of its Guideline.

49.     CVS acknowledges that all valid prescriptions should be filled, but the goal of its Policy is not to ensure the prescriptions are valid, but to protect CVS from potential liability for filling such prescriptions. CVS's Policy does this through the use of the CDC Guideline does and duration thresholds which, by its clear terms, are not meant to be applied by pharmacists nor applied to the prescriptions for patients such as Edith Fuog.

50.     CVS's pharmacists are not required to explain to the patients the true reason why their valid prescriptions are not being filled or why their valid prescriptions are being filled other than as written. Instead, they typically provide no explanation, offer a pretextual explanation, such as being out of stock, or seek to delay any action hoping the patient will go away on his or

her own.  These pretextual excuses are frequently intended to frustrate Plaintiff and provide cover to CVS from further regulatory scrutiny.

51.     In addition to the foregoing, upon information and belief, CVS has inadequately trained its pharmacists with regard to its Policy, resulting in inconsistent application of the Policy, the profiling of patients presenting valid opioid prescriptions as criminals, drug seekers and addicts and its pharmacists either refusing to tell the patient why the valid prescriptions were not being filled as written or providing pretextual reasons, such as the drug being out of stock.

52.     In addition to the foregoing, upon information and belief, CVS has adopted express or implicit requirements that opioid prescriptions not be filled unless accompanied with one or more prescriptions for non-opioid medication.  In the alternative, such requirements are being imposed by individual pharmacists employed by CVS.  There is no medical reason for this requirement, which results in unnecessary increased expenses and costs for Plaintiff and the Class Members.

53.     In addition to the foregoing, upon information and belief, CVS has adopted or will adopt express or implicit requirements that opioid prescriptions not be filled unless and until the person seeking the prescription provide comprehensive medical records which are then reviewed by a CVS employee who is not licensed to practice medicine.  In the alternative, such requirements are being imposed by individual pharmacists employed by CVS.  There is no medical reason for this requirement, which results in unnecessary increased expenses and costs for Plaintiff and the Class Members.

54.     Moreover, upon information and belief, CVS has an internal written or informal policy that mandates that pharmacists and other employees are prohibited from informing Plaintiff and the Class Members why they are refusing to fill a valid opioid prescription.

55.     The express and implicit policies as adopted and applied by CVS punish patients who have, and need, legitimate access to such medication.  In practice and application, they

a.  Interfere with the physician-patient relationship between Plaintiff, and the Class Members, and their physicians, effectively engaging in the unauthorized practice of medicine;

b.  Profile and discriminate against Plaintiff, and the Class Members, through no fault of legitimate pain patients themselves or of the doctors caring for them;

c.  Discriminate against Plaintiff, and the Class Members, based on disability and age; and

d.  Ignore the real problems with opioid abuse and foist the responsibility for the epidemic on Plaintiff, and the Class Members.

56.     Further, CVS's express and implicit policies have led to actions taken by its employees and agents, approved by CVS, such as:

a.  Telling customers, including Plaintiff and the Class Members, that they do not have the prescribed medication in stock without checking to see whether the medication is in fact in stock or when the medication will be in stock;

b.  Reducing the stock of certain opioid medication;

c.  Refusing to fill a prescription for opioids unless additional non-opioid prescriptions are presented for filling;

d.  Refusing to fill prescriptions from certain medical providers;

e.  Making subjective determinations about the patient's reasons and need for the prescribed medication; and/or

f.  Focus more on risk management than the needs of the patient.

57.     CVS's Policy puts even more of a burden on a patient who is unwell and suffering. Plaintiff  and the Class Members, who are afflicted with complex health conditions, already spend hours a week in doctors' offices and on the phone with insurers and billing departments, have limited access to transportation, and are already hindered by pain and fatigue.

58.     CVS is the largest retail pharmacy chain in the United States, filing more than one billion prescriptions each year in 49 states, the District of Columbia and Puerto Rico and serving 4.5 million customers per day.[16]

59.     CVS's 2019 financial statement reflects total revenue of $256.8 billion, Total Revenue Pharmacy Services of $141,491 billion and that 1 in 3 Americans interact with CVS Health annually.   It further states that CVS has (i) approximately 9,900 retail locations, (ii) approximately 1,100 walk-in medical clinics, (iii) a leading pharmacy benefits manager with approximately 105 million plan members, (iv) a senior pharmacy care business serving more than one million patients per year and (v) serves an estimated 37 million people through traditional, voluntary and consumer – directed health insurance products and related services.

## VII.

## EDITH FUOG

### Edith Fuog is Disabled

60.     Plaintiff Edith Fuog is 49 years old.   In 2011, she was diagnosed with Stage-1 Breast Cancer, and underwent surgical bilateral mastectomy and reconstruction.   Ms. Fuog subsequently developed Methicillin-resistant Staphylococcus aureus ("MRSA"), an aggressive form of "flesh-eating" bacteria.   The condition worsened and Ms. Fuog developed an even more deadly bacteria, Vancomycin-Resistant Staphylococcus aureus ("VRSA").   In 2011, only 10 other individuals were known to have contracted VRSA.   As a result of contacting VRSA, Ms. Fuog became septic and is considered HA-MRSA, having to be quarantined each time she is hospitalized.   In 2014, as a result of an unexpected reaction to a vaccine Ms. Fuog was given for her autoimmune disease, she developed Guillian Barre Syndrome and Parsonage Turner

---

[16]     https://cvshealth.com/about/facts-and-company-information.

Syndrome, which caused her to become temporarily paralyzed and causes severe pain in her left shoulder, left chest, and left arm.  She also has major balance/gait issues requiring Ms. Fuog to re-learn to walk and use her fine motor skills.

61.     In addition to these illnesses, Ms. Fuog suffers from Trigeminal Facial Neuralgia, psoriatic arthritis, extensive neuropathies (peripheral, autonomic, mono-neuropathies), Hashimotos Thyroid Disease, Lupus (SLE), Mixed Connective Tissue Disease, Intracranial Hypertension, Degenerative Disc Disease, Osteoarthritis, Spondylitis, CIDP/Chronic Inflammatory Demyelinating Polyneuropathy and SAPHO Syndrome.

62.     These diseases have caused impairments that substantially limit one or more of Ms. Fuog's major life activities.  She is able to sleep for only a few hours at a time.  Due to nerve damage in her legs, Ms. Fuog has restless leg syndrome when she sleeps and a sensation of insects crawling on her legs.  She also sleeps fully clothed due to other sensations caused by nerve damage.

63.     When she is awake, she can walk for short periods inside her home, but, if she leaves her home, she usually uses a wheelchair or a walker for assistance.  She has problems writing because she cannot hold a pen or pencil in her hands for very long.  If she stands for half an hour or more, her ankles and feet will frequently swell, and it will take 1 to 2 weeks of bed rest for the swelling to go down.  She has a great deal of difficulty bending over and picking things up. She cannot perform household chores, shower, prepare food or even brush her hair without assistance, which is mostly provided by her 20-year-old daughter who lives with her.  She has nerve damage to her eyes which prevents her from driving a car at night.  She can drive for short distances during the day; however, whenever she goes outside, she needs to wear UV protective clothing to prevent blistering and swelling from ultraviolet light.  She also suffers from incontinence and cannot ever be too far away from a bathroom.  Her illnesses have left her with

near constant bouts of severe nausea and vomiting which results in her inability to eat for days. There are times when she does not leave her home for up to four weeks in a single stretch.

64.    A good day for Ms. Fuog is waking up after a few hours of restless sleep and being able to brush her teeth, following which she lies on her couch with a heating pad for a few hours. After that, she lets her dog go outside.  She is not able to take her dog for a walk but can let the dog out into the yard.  She might be able to go to the store with her daughter, then come back home and again lie on the couch with her heating pad.  After a few hours, she may be able to get up and cook dinner with her daughter, though, due to her ailments, Ms. Fuog is unable to lift the pots and pans on her own.

65.    Ms. Fuog tried to work at a job ringing up cash sales for 4 hours per week but was unable to do it.  In September 2015, she was found by an administrative judge with the Social Security Administration to be disabled and determined to have been disabled since her filing date of August 19, 2013.

66.    Ms. Fuog has been treated by the same pain doctor since July 2013.  Her prescription opioid pain medication allows her to function to some degree.  Without her prescription opioid pain medication, Ms. Fuog is unable to do much beyond lying in her bed or on her couch.

67.    In 2014 Ms. Fuog was prescribed Dilaudid 8mg and Fentanyl 50mcg patches. Ms. Fuog's Fentanyl prescription was replaced in 2019 with Morphine ER30mg[17].  At all times, while being prescribed these opioids, Ms. Fuog has been under the care of pain management physicians, and has fully complied with all treatment recommendations, never deviating.

---

[17] The ER stands for the extended release formula of the medication.

## Difficulties Filling Her Prescriptions at CVS

68.    Ms. Fuog began experiencing problems with CVS refusing her prescriptions in 2017.  Ms. Fuog was told by a pharmacist at the CVS Pharmacy at 8700 US Highway 301, Parrish, FL 34219, Store #7937, that her opioid prescriptions could no longer be filled at that location.  When Ms. Fuog inquired as to the reason, she was told that since the 2016 CDC guidelines were released, CVS was changing their policy concerning filing opioid prescriptions.  Ms. Fuog had been filling her opioid prescriptions at that particular CVS location since 2015.

69.    Ms. Fuog lodged a complaint with CVS Corporate Headquarters, stating that her prescription should not be refused due to the CDC Guideline thresholds and spoke to a supervisor who told Ms. Fuog there would be a "follow up" and CVS would "let her know what they decided." Ms. Fuog never heard back from anyone at CVS concerning this complaint.   Many times thereafter, Ms. Fuog returned to that particular CVS location, which was close to her residence, only to be told "they did not have [her opioid prescriptions] in stock."  Upon information and belief, this reason was pretextual.

70.    Ms. Fuog also visited the CVS location in Sun City, Florida on several occasions to have her opioid prescriptions filled.  There she was initially told CVS would not fill her opioid prescriptions and on later visits was told that the medicine was not in stock, which she believes was a pretextual reason.

71.     In June of 2017, Ms. Fuog went to a CVS location in Miami where the pharmacist refused to fill her opioid prescription, even though two months before CVS had filled her opioid prescription.  The pharmacist on duty screamed and yelled at her, in front of other customers, when she questioned the refusal.  Ms. Fuog was told by the pharmacist that the pharmacist wasn't comfortable filling her opioid medications, but the pharmacist never explained the reasons for

being "uncomfortable" and suggested that Ms. Fuog  try a CVS pharmacy in Cutler Bay, Florida, where Ms. Fuog had previously lived.

72.     Ms. Fuog filed a complaint with CVS Corporate Headquarters about the incident. She was subsequently advised that the pharmacist might have committed a HIPPA violation by publicly announcing and rejecting her request for opioid medication and they would look into the matter.  Ms. Fuog followed up several times but was never given any information about her complaint.

73.     As a result of this incident, each month, for days prior to seeking to have her opioid prescription filled, Ms. Fuog suffers from extreme anxiety and sickness in her stomach concerning the treatment she might receive when seeking to have her legitimate opioid prescription filled.

74.     In June of 2018, Ms. Fuog moved to Riverview, Florida and went to a CVS pharmacy near her home (CVS Pharmacy at 5905 Us Highway 301 South Riverview, FL 33569 Store #7225), and explained to the pharmacist her situation, including her disability issues and the fact that she is unable to drive at night.  The pharmacist refused to fill her opioid prescriptions or to discuss the issue with her doctor but advised that the store would be happy to fill all her other medications.  Ms. Fuog told the pharmacist she was being discriminated against her because of her disability and subsequently filed a complaint about the matter with CVS Corporate Headquarters, which advised her that she would be informed of the results of an investigation into the matter. She has never received any information from CVS concerning any such investigation.

75.     Subsequently, on August 17, 2018, Ms. Fuog returned to the Riverview CVS to speak with the pharmacy manager about having her opioid prescriptions filed.  Ms. Fuog pleaded with the pharmacy manager to call her doctor to verify her prescription.  The CVS pharmacy

manager refused.  When again Ms. Fuog said she felt she was being discriminated against, the pharmacy manager told her:

> The DEA is going to come in and say we are filling too much.  I am not willing to do it.  Because of the CDC guidelines, the DEA is looking at us too closely.  It is too much of a liability and a risk to fill it.

76.    The people in the store were all staring and listening.  Ms. Fuog practically begged and asked why the pharmacist was discriminating against her, stating that if she asked for Insulin, HIV and/or heart medication, it would be filled, and if not, it would be on the news the next day. Ms. Fuog specifically asked the pharmacist how refusing to fill opioids was any different than refusing any of those other medications.

77.    The pharmacy manager said he would not fill Ms. Fuog's other prescriptions, handed back her opioid prescription and walked away.  It is clear that this denial was not due to the exercise of any professional judgment or even the slightest intent to determine if Plaintiff's prescription was legitimate.

78.    Since then, Ms. Fuog has sought to have her opioid prescriptions filled at (i) a CVS pharmacy located inside a Target store at 10150 Bloomingdale Ave Riverview, FL33578, Store #17311 -- also  near her home where the pharmacist advised her that CVS would only fill her non-opioid medications and (ii) a CVS located in Sarasota, Florida where she was advised by the pharmacist  that he could only fill such prescriptions for his "regular customers."  Since 2017, some two dozen other CVS pharmacies all refused to fill her valid prescriptions for opioids on the basis that the medications either were not in stock or that they would not fill her opioids prescriptions for any reason.  Ms. Fuog would seek to have her prescriptions for opioid medication filled at CVS if the discrimination were ended.

79.    Every time Ms. Fuog complained to CVS corporate about its pharmacists' refusal to fill her valid opioid prescription, she explained that she is disabled and needed her opioid

medication filled so that she could have a semblance of a normal life.  Ms. Fuog would plead with the CVS pharmacist and CVS corporate to call her doctor and verify her prescriptions and diagnosis.

80.     On every occasion, Ms. Fuog offered to provide her medical records for CVS and its pharmacists to review.  She told them she had her records organized on a CD and would be more than willing to give it to them.  She even opened her phone to show the file with all her medical records, including MRI reports, labs, and doctor's notes.  She specifically told them she was "an open book" and would do whatever you need so I can get my prescriptions filled.  She also explained that she was limited with driving and needed to be as close to her home as possible.

81.     Ms. Fuog's treating physician gave her his cell number and she repeatedly offered to call her doctor in the presence of the CVS pharmacist so they could speak with him and answer any concerns they might have.  Specifically, Ms. Fuog asked on every occasion when her opioid prescriptions were refused: "What do you need from me, or what do I need to do so you will fill my prescription."  The CVS pharmacist always refused to speak with her doctor and refused to review her medical history; just telling her "No" or "go somewhere else."  Citing the CDC Guideline as justification, CVS corporate told her it would "look into it, and get back to you," but never doing so.  At every turn, Ms. Fuog's request for an accommodation was rebuffed.

82.     None of the foregoing instances evidence attempts at due diligence or the exercise of professional judgment by CVS's pharmacists to determine if Plaintiff's prescriptions were legitimate.  Plaintiff offered to provide information to answer any unresolved questions or, more often, the pharmacists made no attempt to obtain information to answer any supposedly unresolved questions about her prescription.  The fact that CVS's pharmacists instead encouraged her to go to other CVS locations evidences that they were simply trying to avoid being the pharmacist to fill

her prescriptions.  The traveling around to different pharmacy locations is common among patients with opioid prescriptions exceeding the CDC Guideline dose and duration thresholds and is referred to as the "Pharmacy Crawl."

83.    CVS has acted intentionally and with deliberate indifference to the strong likelihood that a violation of federally protected rights would result from the implementation of its policies and actions.   CVS knew that harm to Ms. Fuog's federally protected rights was substantially likely and failed to act on that likelihood.

84.    Ms. Fuog has suffered compensatory damages due to CVS's intentional discrimination and deliberate indifference.  Since at least January 2017, at least once a month, she has had to spend hours driving around looking for a pharmacy that will fill her prescriptions for opioid medication despite the fact that there is a CVS pharmacy within a few hundred yards of her home.  In addition to the pain-and-suffering she experiences in having to undertake these trips and her mental anguish and fear wondering where and whether she will be able to get her prescriptions for opioid medication filled, CVS's actions have caused her to incur unnecessary increased expense for gas and unnecessary wear and tear of her car.

85.    In addition, beginning in January 2019, her insurance company stopped paying for her prescription opioid medication.  With the insurance coverage, her cost for the prescription opioid medication was a $10 co-pay.   For about a year afterward, she was able to get the prescriptions filled at various pharmacies that provided discounts and the cost to her was about $50.  However, since January 2020, no pharmacy, including CVS, will provide discounts for prescription opioid medication and Ms. Fuog has been forced to pay $320 each month for her prescription opioid medication.  Based upon a CVS app for discounts, Ms. Fuog's cost would be

about $48 if CVS would fill her prescription and give her the discount which they provide for other prescription medication.

## VIII.

### THE CVS POLICY APPLIES EXCLUSIVELY OR DISPROPORTIONATELY TO DISABLED PERSONS

86.     The CVS Policy applies to opioid prescriptions exceeding 90 MME and lasting for more than 7 days.  Opioid prescriptions exceeding these dose and duration thresholds are given to treat severe pain resulting from disabling medical conditions.  An April 2021 Economic Research Report prepared by or for the U.S. Department of Agriculture notes that "Epidemiological survey research has also found a close link between pain and physical disability" and that "physical disability is strongly linked to chronic disease."  The study further states that: "**The tie between physical disability and opioid prescriptions is remarkably strong**."[18]

87.     A March 2021 study by the University of Michigan notes that "preliminary research has suggested a link between opioid prescriptions and disability program participation."  The study states:

> ***There is the potential for a strong relationship between prescription opioid use and disability status*** as determined by Social Security through SSDI or SSI since the conditions that tend to require prescription opioids (chronic pain, musculoskeletal injuries or mental health conditions) also tend to be qualifying conditions for Social Security-administered disability programs.  Both SSDI and SSI require that alleged disabling health conditions last for at least 12 months or be expected to result in death, and prevent the applicant from earning at the substantial gainful activity level ($1,310 per month for nonblind applicants in 2021) (emphasis added).[19]

---

[18]     The Opioid Epidemic: A Geography In Two Phases, pp. 6 & 7. https://www.ers.usda.gov/webdocs/publications/100833/err-287.pdf?v=1708)

[19]     The Causes and Consequences of Opioid Use Among Older Americans: A Panel Survey Approach, pp. 1& 6-7. https://mrdrc.isr.umich.edu/publications/papers/pdf/wp419.pdf

88.     A 2021 study found: "Our data show that individuals with disabilities who use opioids, on average, have a higher incidence of continuous opioid use and significantly greater amounts prescribed compared to other adults who have opioid prescriptions."[20]

89. In a Technical Assistance Document issued on August 5, 2020, the EEOC advised:

*If the patient's pain requires ongoing opioid medication, the underlying medical condition likely qualifies as an ADA disability*.  The ADA's definition of "disability" is different from the one used for Social Security disability benefits – having an ADA disability does not mean that someone can't work.  Conditions like cancer, muscular dystrophy and multiple sclerosis should easily qualify and other conditions may also qualify, like orthopedic conditions that cause pain for which someone is prescribed opioids (emphasis added).[21]

90.     The CDC Guideline cautions that opioid prescriptions should typically not exceed a dosage of 50 MME nor a duration of 3 days without careful consideration by the prescribing doctor.  As these studies suggest, persons receiving prescriptions which exceed the higher end of the dosage (90 MME) and duration (7 days) thresholds are highly likely to be disabled within the meaning of the ADA.

91.     Accordingly, the CVS Policy is facially discriminatory.  The Policy treats persons with opioid prescriptions exceeding the CDC Guideline dose and duration thresholds differently from (i) people with opioid prescriptions below those thresholds and (ii) people without opioid prescriptions.  Due to the correlation between prescriptions exceeding the CDC Guideline dose and duration thresholds and disability, the Policy results in proxy discrimination, which is a form of facial discrimination.

92.     Even assuming not every person with an opioid prescription exceeding the CDC Guideline dose and duration thresholds is disabled within the meaning of the ADA, the use by

---

[20]   https://ideas.repec.org/a/spr/aphecp/v19y2021i3d10.1007_s40258-020-00622-4.html.
[21]   https://www.eeoc.gov/laws/guidance/how-health-care-providers-can-help-current-and-former-patients-who-have-used-opioids, Question 2, p. 3.

CVS of the CDC Guideline dose and duration thresholds in its Policy to differentiate among its prescription customers is, at best, facially neutral over-discrimination whereby CVS recognizes that while its Policy will disproportionately affect disabled persons, it may also affect nondisabled persons.

## IX.

### THE CVS POLICY TREATS DISABLED PERSONS DISPARATELY

93.     The test for disparate treatment is deliberate indifference, which requires knowledge that a harm to a federally protected right is substantially likely and a failure to act upon that the likelihood.   When CVS adopted the dosage and duration thresholds from the CDC Guideline as part of its  Policy, it knew that:

- the Guideline was directed to clinicians and not pharmacists,
- the Guideline was never intended for the purpose for which they were using it,
- the Guideline was only a recommendation, and
- the Guideline's dosage and duration thresholds were meant for acute pain and people just starting opioid medication.

94.     CVS knew that applying these thresholds to persons presenting valid opioid prescriptions exceeding those thresholds and who were not starting opioid medication was an inappropriate application of the CDC Guideline and that it was substantially likely to impact disabled persons seeking to have those valid prescriptions filled.  CVS knew this from:

- public complaints by the AMA,
- the CDC's own warning that its Guideline should not be misapplied, and
- complaints from its own customers.

95.     Nonetheless, CVS took no action to prevent the misapplication of the Guideline to disabled persons by its Policy and its pharmacists.

**X.**

**THE CVS POLICY DISPARATELY IMPACT DISABLED PERSONS**

96.     The CVS Policy also disparately impacts disabled persons.  The CVS Policy treats patients with valid opioid prescriptions exceeding the dosage and duration thresholds in the CDC Guideline differently from other patients seeking to fill prescriptions.  Those with prescriptions exceeding the dosage and duration thresholds in the CDC Guideline are disabled within the meaning of the ADA and are substantially less likely to get their prescriptions filled as written than are those whose prescriptions for opioids do not exceed the dosage and duration thresholds in the CDC Guideline and those with non-opioid prescriptions.  In 2018, for example, there were 168,158,611 opioid prescriptions issued in the United States.  Of these, 59,492,722 were for more than 7 days.  Additionally, 12,597,565, or 7.5% of the total, exceeded 90 MME.[22]  While it is unclear how many prescriptions were for more than 7 days and exceeded 90 MME, it seems clear a substantial number of prescriptions written in 2018 were/would have been subjected to the dosage and duration thresholds in the CVS Policy and those prescriptions were written for people who disproportionately qualify as disabled within the meaning of the ADA.  In 2018, CVS had a market share of prescription drug revenue of 24.2%.[23]

**XI.**

**THE CVS POLICY DENIES
MEANINGFUL ACCESS TO DISABLED PERSONS**

97.     Plaintiff, and the Class she seeks to represent, have been, and are being, denied meaningful access to their valid prescription opioid medication exceeding the dose and duration thresholds of the CDC Guideline.  They are unable to get their valid prescriptions filled in the same

---

[22]   https://www.cdc.gov/drugoverdose/pdf/pubs/2018-cdc-drug-surveillance-report.pdf, Table 1B.

[23]   https://www.drugchannels.net/2019/02/the-top-15-us-pharmacies-of-2018-m.html.

manner as are (i) people with opioid prescriptions that do not exceed the dose and duration thresholds of the CDC Guideline and (ii) people with non-opioid prescriptions.  Their access is not meaningful because unlike other customers attempting to fill prescriptions, they

- have to plan a schedule for attempting to fill their prescription several days beforehand,
- have to be prepared to spend hours traveling to multiple stores at various distances from their homes to fill their prescriptions,
- cannot use a drive through lane but must go inside the store,
- have to dress certain ways before going into the pharmacy, such as getting nicely dressed, putting on makeup and earrings/jewelry, doing her hair, painting our nails in case the pharmacist is looking at her "grooming" habits to determine if she is a "junkie/addict"  (If her nail polish was chipped on just one nail, she would redo it);
- have to avoid paying in cash if possible,
- risk being put on a "blacklist,"
- expect they will be pressured or required to take a lower dose or fewer pills of their prescription medication than what is prescribed,
- expect they will have to wait hours before their prescriptions are filled and/or be required to come back at inconvenient times,
- expect they may be required to purchase additional medication to get their prescription filled, and
- expect they will be given multiple, inconsistent reasons at the different pharmacies for why their prescription cannot be filled, if they are given any reason at all.

## XII.

## CVS HAS FAILED TO MAKE REASONABLE MODIFICATIONS TO ITS OPIOID DISPENSING POLICY, PRACTICES AND PROCEDURES

98.     Discrimination includes "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities."  42 U.S.C. §12182(b)(2)(A).

99.     Plaintiff has complained to CVS's pharmacists and corporate headquarters about her treatment under its Policy.  More specifically, in these complaints she has verbally:

- Explained that she is disabled and needed her opioid medication filled so that she could have a semblance of a normal life;

- Asked that pharmacists be required to call her doctor to verify the legitimacy of her prescriptions;

- Offered to provide her medical records; and/or

- Asked that she be informed of the reasons why her prescriptions were refused, so she could help resolve the issue.

100.     Upon information and belief, numerous other CVS customers have also complained to CVS about its Policy for opioid prescriptions exceeding the CDC Guideline dose and duration thresholds.  Public organizations, such as the AMA and the CDC itself, have publicly complained about the inappropriate incorporation of the CDC Guideline dose and duration thresholds into company policies.  On September 28, 2017, Dr. James Holly, a medical doctor, wrote and published an open letter to CVS asking that its Policy be reconsidered, but the request was obviously ignored and/or rejected. [24]

101.     A request for a reasonable modification of a policy need not take any specific form nor use any particular language.  A request for a reasonable modification of a policy is not necessary when the defendant is aware of a disability requiring accommodation.  The foregoing is sufficient to constitute a request by Plaintiff for a reasonable modification of CVS's Policy, to the extent such a request is legally necessary and/or to put CVS on notice of the need to modify its Policy and procedures without the need for any request by Plaintiff.  In the alternative, requesting reasonable modification was unnecessary and/or would be futile.

102.     The Department of Justice has published a Technical Assistance Manual to address compliance with Title III of the ADA.  The Manual provides several illustrations of this requirement, including the following:

> ILLUSTRATION 3:  A retail store has a policy of not taking special orders for out-of-stock merchandise unless the customer appears personally to sign the order.  The

---

[24] http://www.jameslhollymd.com/Your-Life-Your-Health/letter-to-cvs-ceo-article.

store would be required to reasonably modify its procedures to allow the taking of special orders by phone from persons with disabilities who cannot visit the store. If the store's concern is obtaining a guarantee of payment that a signed order would provide, the store could, for example, take orders by mail or take credit card orders by telephone from persons with disabilities.[25]

103.    The Technical Assistance Manual also provides that: "A public accommodation may not impose eligibility criteria that either screen out or tend to screen out persons with disabilities from fully and equally enjoying any goods, services, privileges, advantages, or accommodations offered to individuals without disabilities."   It includes the following illustrations:

ILLUSTRATION 1:  A restaurant has an unofficial policy of seating individuals with visible disabilities in the least desirable parts of the restaurant.  This policy violates the ADA because it establishes an eligibility criterion that discriminates against individuals with certain disabilities and that is not necessary for the operation of the restaurant.  The restaurant may not justify its policy on the basis of the preferences of its other customers.

ILLUSTRATION 2:  A parking garage refuses to allow vans to park inside even though the garage has adequate roof clearance and space for vans.  Although the garage operator does not intend to discriminate against individuals with disabilities, the garage's policy unnecessarily tends to screen out people with certain mobility impairments who, in order to have enough space for mobility aids such as wheelchairs, use vans rather than cars.[26]

104.    The improper use of the dosage and duration thresholds in the CDC Guideline acts as de facto eligibility criteria that screens out or tends to screen out persons with disabilities from fully and equally enjoying any goods, services, privileges, advantages, or accommodations offered to individuals without disabilities.  Thus, Plaintiff, and the Class, do not have a similar or "like" experience as non-disabled persons presenting prescriptions for non-opioid medication or

---

[25]    https://www.ada.gov/taman3.html, III-4.2100.

[26]    https://www.ada.gov/taman3.html, III-4.1100.

for opioid medication which does not exceed the dosage and duration thresholds in the CDC Guideline.

105.     Even if the CVS Policy applied to non-disabled persons, a modification of the Policies would still be necessary.  The DOJ's Technical Assistance Manual illustration of the parking garage which does not allow vans even though the garage has adequate roof clearance and space for vans makes this clear.  In that illustration, the policy obviously applies to both disabled and non-disabled persons, yet modification is still necessary.

106.     The CVS Policy, and the related procedures and training, should be modified as follows:

1. Provide annual or additional training to all pharmacists and initial training for newly hired pharmacists on the appropriate and inappropriate use of the CDC Guideline on Prescribing Opioids with respect to filling opioid prescriptions, which training:

   a. Explains the purpose of the CDC Guideline;

   b. Explains the limitations of the CDC Guideline;

   c. Discusses potential misapplications of the CDC Guideline;

   d. Provides training on valid medical reasons why an opioid prescription exceeding the CDC Guideline dose and duration thresholds might be legitimate;

   e. Emphasizes that all legitimate prescriptions are to be filled as written, including opioid prescriptions exceeding the CDC Guideline dose and duration thresholds;

   f. Emphasizes that the filling of opioid prescriptions exceeding the CDC Guideline dose and duration thresholds as written is not discouraged merely because such prescriptions exceed the CDC Guideline dose and duration thresholds;

   g. Emphasizes that customers presenting opioid prescriptions exceeding the CDC Guideline dose and duration thresholds are to be treated with respect, courteously and as any other customer, not as drug addicts or abusers.

2. Instruct and require that the specific reason(s) for refusing to fill opioid prescriptions exceeding the CDC Guideline dose and duration thresholds as written must be clearly documented internally.

3. Instruct and require that all customers are entitled to and shall be informed of the specific reason(s) for refusing to fill any opioid prescriptions, especially those

exceeding the CDC Guideline dose and duration thresholds, which can be remedied by the customer,

4. Instruct that the fact that an opioid prescription exceeds the CDC Guideline dose and duration thresholds is insufficient in and of itself to refuse to fill the prescription;

5. Instruct that no customer presenting an otherwise legitimate and proper prescription for opioids should be refused the medication for any arbitrary reason, any reason based on the personal bias of the pharmacist against opioids or opioid customers, or for any reason whose sole purpose is to discriminate against opioid customers or treat them differently than customers presenting prescriptions for medications other than opioids;

6. To the extent that Defendant has implemented a policy requiring the rejection, denial or delay in filing an otherwise legitimate and proper prescriptions for opioids based solely on the CDC Guidelines, the repeal of said policy and publication of its repeal to all company pharmacists;

7. Provide clear criteria by which a physician may request exemption of specific patients; and

8. Any other modification determined to be reasonable and necessary under the law.

## XIII.

## CAUSES OF ACTION

### COUNT I
### Violation of Americans with Disabilities Act
### (42 U.S.C. §12101 *et seq*)

107.    Plaintiff repeats, realleges and adopts all prior paragraphs as if fully set forth herein.

108.    Title III of the Americans with Disabilities Act ("ADA") provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. §12182(a).

109.    Plaintiff is disabled and has physical or mental impairments that substantially limit one or more of her major life activities within the meaning of the ADA.

110.    The Members of the putative Class are also disabled within the meaning of the ADA.  Patients with valid opioid prescriptions exceeding the CDC Guideline dosage and duration thresholds are prescribed such medication because they suffer from conditions which render them disabled within the meaning of the ADA.  Such patients tend to be either High Impact chronic pain patients, defined as having pain that lasts 3 months or longer accompanied by at least one major activity restriction,[27] cancer patients, or patients receiving palliative care.

111.    Defendants own, lease and/or operate places of public accommodation within the meaning of the ADA.

112.    On the basis of their disability, Plaintiff, and the Class Members, are discriminated against and deprived of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the places of public accommodation owned, leased and/or operated by Defendants through their adoption, use and application of policies, practices and procedures which, among other things, result in (i) the refusal to dispense opioid medication as prescribed (either in amount or strength) when presented with legitimate prescriptions from patients suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia; (ii) the requirement that Plaintiff, and the Class Members, present and/or purchase additional prescription medication or present other information in order to have her opioid prescriptions filled; (iii) the decision of whether an opioid prescription is medically necessary being made by someone other than a medical doctor licensed to practice medicine and/or (iv) Plaintiff, and the Class Members, being blacklisted, flagged or otherwise included on a list or database as potentially abusing opioid medication.

---

[27]    https://www.nccih.nih.gov/research/research-results/prevalence-and-profile-of-high-impact-chronic-pain.

113.    Defendants' conduct is ongoing and continuous, and Plaintiff, and the Class Members, have been harmed and continue to be harmed by Defendants' conduct.  Unless Defendants are restrained from continuing their ongoing and continuous course of conduct, Defendants will continue to violate the ADA and will continue to inflict injury upon Plaintiff and the Class Members.

114.    Plaintiff, and the Class Members, are entitled to injunctive relief and reasonable attorney's fees and costs from Defendants for their violation of the ADA.  Specifically, Plaintiff and the Class Members request this Court:

a.  Enjoin Defendants from refusing to dispense opioid medication as prescribed when presented with legitimate prescriptions from patients suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia;

b.  Enjoin Defendants from requiring that Plaintiff and the Class Members present prescriptions for, and/or purchase, additional non-opioid prescription medication in order to have their opioid prescriptions filled;

c.  Enjoin Defendants from making, and/or allowing to be made, the decision of whether an opioid prescription is medically necessary by someone other than a medical doctor licensed to practice medicine;

d.  Order Defendants to develop opioid policies, and train their employees, agents, representatives, contractors and staff on such policies, that distinguish between acute pain patients and patients suffering from High Impact chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia;

e.  Order Defendants to produce and explain their use of all databases and data analytics employed in connection with patients presenting prescriptions for opioid medication;

f.  Order Defendants to identify any Class Member who has been blacklisted, flagged or otherwise included on a list or database as potentially abusing opioid medication and clear the Class Member from such list or database;

g.  Order Defendants to pay Plaintiff's and the Class's reasonable attorney's fees and costs; and/or

h.  Order all other relief to which Plaintiff, and the Class Members, are justly entitled.

**COUNT II**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**(29 U.S.C. §794)**

115.    Plaintiff repeats, realleges and adopts all prior paragraphs as if fully set forth herein.

116.    At all times relevant to this action, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, was in full force and effect in the United States.

117.    The Rehabilitation Act forbids programs or activities receiving Federal financial assistance from, among other things, discriminating against otherwise qualified individuals with disabilities.

118.    Plaintiff, and the Class Members, are qualified individuals with disabilities within the meaning of the Rehabilitation Act.  As patients who require opioid pain medication exceeding the CDC Guideline dose and duration threshold, they have "a physical or mental impairment that substantially limits one or more major life activities."

119.    Defendants are subject to the Rehabilitation Act due to the fact that they receive Federal financial assistance from the United States Department of Health and Human Services, including Medicare provider payments from the centers for Medicare/Medicaid Services under Title XVIII, Part D of the Social Security Act, 42 U.S.C. §1395 *et seq*.

120.    Defendants, through their discriminatory practices towards the Plaintiff and the Class Members, based upon their disabilities, have violated and continue to violate the Rehabilitation Act by, *inter alia*, denying disabled individuals, including Plaintiff and the Class Members, the full and equal goods, services, facilities, privileges, advantages or accommodations of their retail pharmacies throughout the United States.

121.    The discriminatory actions of the Defendants alleged herein were undertaken solely on the basis of Plaintiff's and the Class Members' disabilities.  Due to Defendants' acts of

discrimination as alleged herein, Plaintiff and the Class Members have not been provided meaningful access to their life-sustaining medications.

122.    Defendants' conduct has harmed Plaintiff and the Class Members and will continue to harm Plaintiff and the Class Members unless and until Defendants are ordered by this Court to cease the following activities:

a.  Enjoin Defendants from refusing to dispense opioid medication as prescribed when presented with legitimate prescriptions from patients suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia;

b.  Enjoin Defendants from requiring that Plaintiff and the Class Members present prescriptions for, and/or purchase, additional non-opioid prescription medication in order to have their opioid prescriptions filled;

c.  Enjoin Defendants from making, and/or allowing to be made, the decision of whether an opioid prescription is medically necessary by someone other than a medical doctor licensed to practice medicine;

d.  Order Defendants to develop opioid policies, and train their employees, agents, representatives, contractors and staff on such policies, that distinguish between acute pain patients and patients suffering from High Impact chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia;

e.  Order Defendants to produce and explain their use of all databases and data analytics employed in connection with patients presenting prescriptions for opioid medication;

f.  Order Defendants to identify any Class Member who has been blacklisted, flagged or otherwise included on a list or database as potentially abusing opioid medication and clear the Class Member from such list or database;

g.  Order Defendants to pay Plaintiff's and the Class's reasonable attorney's fees and costs; and/or

h.  Order all other relief to which Plaintiff, and the Class Members, are justly entitled.

123.    Defendants' conduct has caused recoverable damages to Plaintiff and the Class Members.

**COUNT III**
**Violation of the Anti-Discrimination**
**Provisions of the Affordable Care Act**
**(42 U.S.C. §18116)**

124.     Plaintiff repeats, realleges and adopts all prior paragraphs as if fully set forth herein.

125.     Section 1557 of the Patient Protection and Affordable Care Act ("ACA") (codified at 42 U.S.C. §18116) was established to combat healthcare discrimination by any health program, healthcare entity, or activity that receives federal funding.  This Act of Congress makes it illegal to discriminate against individuals based upon their race, national origin, gender, age, or disability. Section 1557 of the ACA protects individuals from discrimination in any health program or activity of a recipient of federal financial assistance, such as hospitals, clinics, employers, retail community pharmacies or insurance companies that receive federal money.  Section 1557 specifically extends its discrimination prohibition to entities that receive federal financial assistance in the form of contracts of insurance, credits, or subsidies, as well as any program or activity administered by an executive agency, including federal health programs like Medicare, Medicaid, and CHiP.

126.     Recipients of Federal financial assistance, such as Defendants, are prohibited from providing "any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program."  See 45 C.F.R. §80.3(a)(ii).  Federal financial assistance has been interpreted and enforced to cover a broad range of programs receiving federal funds.

127.     Defendants are subject to Section 1557 due to the fact that they receive Federal financial assistance from the United States Department of Health and Human Services, including Medicare provider payments from the centers for Medicare/Medicaid Services under Title XVIII, Part D of the Social Security Act, 42 U.S.C. §1395 *et seq.*

128.     Defendants meet the qualifications for being a "health program or activity, any part of which is receiving Federal financial assistance" under Section 1557(a).

129.     Furthermore, Defendants represent that they are subject to Section 1557 of the ACA, and under that law:

> [C]omplies with applicable Federal Civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex. CVS Pharmacy, Inc. does not exclude people or treat them differently because of race, color, national origin, age, **disability** or sex (emphasis added).

(*See* https://www.cvs.com/bizcontent/general/CVS_Pharmacy_Nondiscrimination_Policy.pdf.)

130.     Plaintiff and the Class Members are disabled under both the ADA and Section 504 of the Rehabilitation Act.   The discriminatory actions of the Defendants alleged herein were undertaken solely on the basis of Plaintiff's and the Class Members' disabilities.   Due to Defendants' acts of discrimination alleged herein, Plaintiff and the Class Members have not been provided meaningful access to their life-sustaining medications.

131.     Defendants' actions have violated and continue to violate Section 1557(a) of the Affordable Care Act by intentionally causing Plaintiff and the Class Members to "be excluded from participation in, be denied the benefits or, or be subjected to discrimination under any health program or activity, any part of which is receiving Federal financial assistance" based on disability which is a prohibited ground of discrimination under Title IX.

132.     Plaintiff and the Class Members have suffered damages by this violation of Section 1557(a) in the denial of access to necessary medical care and/or services including, though not limited to, the filing and receipt of their valid opioid prescription medication.

133.     Plaintiff and the Class Members request Declaratory and injunctive relief to protect their rights under Section 1557(a), and to remedy the Defendants' continued violation of Section 1557(a).

134.    Plaintiff and the Class Members have been harmed as a result of Defendants' conduct and are entitled to compensatory damages, attorneys' fees and costs, and all other additional appropriate relief as may be available under this cause of action and the applicable law.

## IX.

## JURY DEMAND

135.    Plaintiff and the Class Members request a jury trial on all issues triable by a jury.

## X.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and the members of the class she represents, prays for:

1. An Order certifying the class proposed by Plaintiff, naming Plaintiff as class representative, and appointing her counsel as class counsel;

2. A declaratory judgment that Defendants are in violation of the ADA, the ACA and the Rehabilitation Act of 1973;

3. Injunctive relief as prayed for herein;

4. An award of compensatory damages, pursuant to 42 U.S.C. §18116, to Plaintiff and the Class Members in an amount determined by the jury that would fully compensate them for the injuries by Defendants' discriminatory conduct;

5. An award of punitive damages, pursuant to 42 U.S.C. §18116, to Plaintiff and the Class Members in an amount determined by the jury, but no less than three times the amount of actual damages, that would punish Defendants for the intentional, willful, wanton, and reckless discriminatory behavior;

6. Payment of costs of suit;

7. Payment of reasonable attorneys' fees; and,

8. All other relief to which Plaintiff, and the class she represents, are justly entitled as a matter

of law or equity.

Respectfully Submitted,

By their Attorneys,

/s/ Stephen M. Prignano
Stephen M. Prignano, Esquire (#3649)
MCINTYRE TATE LLP
50 Park Row West, Suite 109
Providence, Rhode Island 02903
(401) 351-7700
(401) 331-6095 (Fax)
SPrignano@McIntyreTate.com

Attorneys for Plaintiff Edith Fuog and all those
similarly situated

**OF COUNSEL**

Scott D. Hirsch (scott@scotthirschlawgroup.com)
SCOTT HIRSCH LAW GROUP
7301 W Palmetto Park Rd #207A
Boca Raton, FL 33433
Telephone:  (561) 569-7062

Joseph A. Bruno (jbruno@brunobrunolaw.com)
BRUNO & BRUNO
855 Baronne St
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

Robert Redfearn (Robertr@SPSR-law.com)
Robert L. Redfearn, Jr. (Robertjr@SPSR-law.com)
30th Floor, Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-3000
Telephone:  (504) 569-2030
Facsimile:  (504) 569-2999

Mark Kepple (mkepple@baileywyant.com)
1219 Chapline St.
Wheeling, W. Va.  26003
Telephone: (304) 233-3100
Facsimile:  (304) 343-3133

Thomas D. Haklar (thaklar@haklarlaw.com)
LAW OFFICE OF THOMAS D. HAKLAR
320 Encinitas Blvd., Suite A
Encinitas, CA 92024
Telephone:  (858) 481-5454
Facsimile: ( 858) 720-9797

Ted Huge (Ted@harrisandhuge.com)
HARRIS & HUGE, LLC
180 Spring St.
Charleston, SC 29403
Telephone:  (843) 805-8031
Facsimile:  (843) 636-3375

## CERTIFICATE OF SERVICE

I certify that on October 22, 2021 this document was filed electronically and is available for

viewing and downloading from the court's CM/ECF system, and that all parties will receive

notice through the CM/ECF system.

/s/*Stephen M. Prignano*