```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF RHODE ISLAND
_____
                           )
EDITH FUOG,                )
                           )
     Plaintiff,            )
                           )
     v.                    )    C.A. No. 20-337 WES
                           )
CVS PHARMACY, INC., et al. )
                           )
     Defendants.           )
_____)
```

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, District Judge.

Edith Fuog suffers from a long list of serious medical conditions, many of which stem from her 2011 breast cancer diagnosis and subsequent MRSA[1] infection. Second Amend. Class Action Compl. ("SAC") ¶ 60-61, ECF No. 40. No one disputes that Ms. Fuog is disabled, nor that her life involves a constant struggle with chronic pain, for which her doctors have prescribed her opioids. Id. ¶¶ 62-67. Rather, in this case, the parties spar over the cause and legality of an additional struggle faced by Ms. Fuog: filling her opioid prescriptions at CVS pharmacies.

More specifically, Ms. Fuog alleges in this putative class action that two business segments of non-party CVS Health Corporation, Defendants CVS Pharmacy, Inc. and Caremark PHC,

---

[1] MRSA stands for Methicillin-resistant Staphylococcus aureus.

L.L.C. ("CVS Caremark" collectively, "CVS"), have misinterpreted guidance from the Center for Disease Control ("CDC") by instituting formal and informal polices which discourage or prohibit its pharmacists from filling opioid prescriptions above a certain dose and duration threshold. Id. ¶ 46. She contends this constitutes unlawful discrimination against the disabled in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182(a) (Count I); Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) (Count II); and the anti-discrimination provisions of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116(a). Before the Court is Defendants' Motion to Dismiss Plaintiff's Second Amended Class Action Complaint, ECF No. 42. For the reasons that follow, that Motion is GRANTED in part, and DENIED in part.

I.  BACKGROUND

This case arises against the backdrop of the opioid epidemic and the torrent of litigation it spawned. See id. ¶¶ 31-32. Ms. Fuog alleges that when CVS was sued more than 2,000 times for allegedly dispensing too many opioids too freely, it overcorrected by implementing policies that unfairly and illegally prevent its pharmacists from filling opioid prescriptions for a class of disabled chronic pain sufferers who need them. Id. ¶ 33, 34.

She claims that these policies are based on a fundamental misinterpretation of the CDC Guideline for Prescribing Opioids for Chronic Pain, issued in 2016. Id. ¶ 33, 34 (quoting Deborah Dowell

2

et al., <u>CDC Guideline for Prescribing Opioids for Chronic Pain — United States</u>, ("2016 Guideline") 65(1) Morbidity & Mortality Weekly Reports 1 (March 2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm); <u>see also</u> SAC ¶ 46. By its plain terms, this guidance was directed to clinicians, pertained only to individuals starting opioids, and excepted cancer treatment and palliative care. SAC ¶ 33. Ms. Fuog's Complaint focuses primarily the alleged misapplication of two specific recommendations:

> 5. When opioids are started, clinicians should prescribe the lowest effective dosage. Clinicians should use caution when prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and risks when considering increasing dosage to ≥50 morphine milligram equivalents (MME)/day, and should avoid increasing dosage to ≥90 MME/day or carefully justify a decision to titrate dosage to ≥90 MME/day.
>
> 6. Long-term opioid use often begins with treatment of acute pain. When opioids are used for acute pain, clinicians should prescribe the lowest effective dose of immediate-release opioids and should prescribe no greater quantity than needed for the expected duration of pain severe enough to require opioids. Three days or less will often be sufficient; more than seven days will rarely be needed.

<u>Id.</u> (quoting 2016 Guideline at 22-24). Instead of understanding these doctor-directed recommendations in context, Ms. Fuog alleges, on information and belief, that CVS misinterpreted this guideline, such that

> when patients present prescriptions for opioid medication exceeding both the CDC Guideline's 90 MME dosage and 7-day thresholds, CVS, through its Opioid

3

> Dispensing Policy, and related Practices, Procedures and Training, incentivizes, pressures and/or instructs, expressly or implicitly, its pharmacists to not fill such prescriptions and/or fill them at lesser amounts which do not exceed the CDC Guideline dose and duration thresholds, treating those thresholds as hard and fast limits.

Id. ¶ 46. To support her allegation that CVS has this policy she points to two relevant[2] sets of facts: (1) findings of major medical organizations, including the CDC itself, that some national pharmacy chains were misapplying the 2016 Guideline; and (2) Ms. Fuog's experiences in attempting to get her prescriptions filled by CVS pharmacists.

    A. Statements by National Medical Organizations

Several national medical organizations have concluded that nationwide pharmacy chains and insurance plans were misinterpreting the 2016 Guideline to wrongly impose limits on opioid prescriptions. Id. ¶¶ 35-43. In 2019, the Board of Trustees of the American Medical Association ("AMA") issued a report finding that "national pharmacy chains, health insurance

---

[2] The parties expend significant effort arguing over the importance of a policy announced by CVS Caremark. See Mem. Supp. Defs.' Mot. Dismiss ("MTD Mem.") 7-13, ECF No. 42-1; Pl.'s Opp'n Defs.' Mot. Dismiss ("Opp'n Mem.") 6-8, ECF No. 43. To the extent CVS argues this document, by its plain terms, does not support Plaintiff's allegations of a purported policy governing CVS's pharmacists, the Court agrees. Neither, however, does it evince the opposite conclusion – that CVS retail pharmacists are not governed by such a policy. Rather, as to retail pharmacists, the Court treats the CVS Caremark policy as an evidentiary zero, which neither supports nor weighs against the plausibility of her key allegation.

4

companies and [Pharmacy Benefit Managers (PBMs)]s have implemented their own restrictive opioid prescribing policies," and that those policies were "some variation" of the 2016 Guideline, especially recommendations 5 and 6. Id. ¶ 36. Similarly, the U.S. Department of Health and Human Services convened a federal, interagency taskforce on pain management best practices. It issued a 2019 report finding there to be a "recent advent of retail pharmacies limiting the duration of prescriptions, making unrequested changes to dosages, or placing barriers to obtaining properly prescribed pain medications." Id. ¶ 38. The taskforce found this stemmed from "widespread misinterpretation of the CDC Guideline," and guideline 6 especially. Id. Finally, the CDC itself issued a press release expressing its concerns that its guideline was being misapplied and misconstrued as hard and fast limits. Id. ¶ 39. In particular, the CDC noted that "policies that mandate hard limits conflict with the Guideline's emphasis on individualized assessment of the benefits and risks of opioids given the specific circumstances and unique needs of each patient." Dep't. Health & Human Services, CDC Advises Against Misapplication of the Guideline for Prescribing Opioids for Chronic Pain, Press Release (Apr. 24, 2019), https://www.cdc.gov/media/releases/2019/s0424-advises-misapplication-guideline-prescribing-opioids.html .

B. Ms. Fuog at CVS

Ms. Fuog supports her contention that CVS has a hard-limit policy by detailing her experiences getting her prescriptions filled after the 2016 Guideline was issued. See SAC ¶¶ 68-78. In particular, she alleges one pharmacist "told [her] that since the 2016 CDC guidelines were released, CVS was changing their policy concerning fil[l]ing opioid prescriptions." Id. ¶ 68. Another pharmacy manager allegedly said, "[t]he DEA is going to come in and say we are filling too much. I am not willing to do it. Because of the CDC guidelines, the DEA is looking at us too closely. It is too much of a liability and a risk to fill it." Id. ¶ 75.

In addition to these statements, Ms. Fuog recounts a series of encounters across a broad range of CVS pharmacies in Florida where she was not able to fill her opioid prescriptions. In total, her Complaint details her efforts at six specific CVS pharmacies and alleges that she made attempts at some two dozen others. Id. ¶¶ 68-74, 78. She asserts that on every occasion she offered to provide her medical records to the pharmacist, id. ¶ 80, that she complained to CVS Corporate Headquarters at least twice, id. ¶¶ 69, 72, and that she outright pleaded with pharmacists to call her doctor on his personal cell phone, id. ¶ 81. In none of these instances was she able to get her prescriptions filled. Id. ¶ 78. Her complaints to CVS corporate went unanswered. Id. ¶¶ 69, 72.

6

C. Studies Supporting Correlation

Finally, Ms. Fuog points to a series of studies indicating a strong statistical correlation between rates of disability and the prevalence and size of opioid prescriptions. Id. ¶¶ 86-89; see e.g., id. ¶ 86 ("The tie between physical disability and opioid prescriptions is remarkably strong." (quoting David A. McGranahan and Timothy S. Parker, The Opioid Epidemic: A Geography In Two Phases, ERR-287, U.S. Dep't Agric., Econ. Rsch. Service 6-7 (April 2021), at https://www.ers.usda.gov/webdocs/publications/100833/err-287.pdf?v=1708)); id. ¶ 88 ("Our data show that individuals with disabilities who use opioids, on average, have a higher incidence of continuous opioid use and significantly greater amounts prescribed compared to other adults who have opioid prescriptions." (quoting Orgul Ozturk et al., Prescription Drug Monitoring Programs and Opioid Prescriptions for Disability Conditions, 19(3) Applied Health Econ. and Health Pol'y 415 (May 2021))).

These studies, along with more detailed allegations about the purported policy at CVS pharmacies, were not included in the First Amended Complaint, which the Court dismissed on CVS's motion. See Sept. 24, 2021, Mem. & Order ("Mem. & Order") 2, ECF No. 39. However, because the Court concluded it might be possible for the various pleading deficiencies it identified to be cured, it granted Ms. Fuog conditional leave to amend her Complaint. Id. 16-17.

7

She seized that opportunity, and her Second Amended Complaint is ripe for testing on CVS's Second Motion to Dismiss.

## II. LEGAL STANDARD

Under the familiar standard of Rule 12(b)(6), the Court must accept "well-pled facts in the complaint as true, and draw[] all reasonable inferences in favor of the plaintiff." Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019). Neither "labels and conclusions," nor "a formulaic recitation of the elements of a cause of action" will suffice. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556).

## III. DISCUSSION

### A. Plausibility Challenges

#### 1. Plausibility of the Purported Policy as Pleaded

First, CVS challenges whether Ms. Fuog has plausibly pleaded that it has the policy she claims it does, namely a hard-and-fast dose and duration limit set at 90 MME/day and seven days. See Mem. Supp. Defs.' Mot. Dismiss ("MTD Mem.") 7-13, ECF No. 42-1.

8

On review of the whole Complaint, the Court concludes this key allegation clears the plausibility bar; it is well-supported by other specific factual pleadings and the reasonable inferences that flow from them.

As noted, a series of national medical organizations, including the CDC itself, have concluded that the 2016 Guideline is being widely misapplied, specifically by national pharmacy chains. CVS is a paradigmatic U.S. national pharmacy chain. Ms. Fuog also recounts a pattern of rejection across nearly 30 CVS locations. It is reasonable to infer the existence of some type of operative policy from this pattern of rejections.[3] The specific statements by pharmacists referencing the guideline coupled with the findings of the AMA, the HHS taskforce, and the CDC itself, makes it reasonable to infer this policy is tied to the 2016 Guideline. Thus, Plaintiff's specific allegation to that effect crosses the line from merely possible to distinctly plausible.

---

[3] These factual allegations also clearly distinguish this case from Smith v. Walgreens Boots All., Inc., No. 20-cv-05451-CRB, 2021 WL 3861451, at *5 (N.D. Cal. Aug. 30, 2021) ("Smith II"). In Smith, that court found the plaintiff failed to plausibly plead that either Walgreens or Costco had a policy like the one alleged here. Id. at *5-6. The court reached that conclusion because the details of the policy alleged were unclear (triggered by a prescription that was for more than either 3 or 7 days or a morphine milligram equivalent (MME/day) of either 50 or 90 MME/days) and because the rejections were plausibly explained by other factors. Also, Ms. Smith had been rejected at Costco on 3 occasions, not 30, and had been able to "regularly" fill her prescriptions at Walgreens, despite some intermittent problems.

2. Claim against CVS Caremark

Next, CVS contends the Complaint does not allege sufficient facts to state a claim against CVS Caremark. Upon further consideration of these arguments, the Court agrees. The only two facts pleaded about CVS Caremark specifically are that it provides prescription benefit management services, SAC ¶ 11, and that Ms. Fuog's insurance stopped paying for her medication, id. ¶ 85. Even considering the additional facts Ms. Fuog proffers in her opposition briefing, see Pl.'s Opp'n Defs.' Mot. Dismiss ("Opp'n Mem.") 20, ECF No. 43, these facts only pertain to whether her prescriptions were covered by insurance, not whether they were dispensed at all. The operative counts of Ms. Fuog's Complaint are exclusively about the alleged discriminatory burden of being unable to get her prescriptions filled in accordance with the medical judgment of her doctor. See SAC ¶¶ 107-114 (ADA); SAC ¶¶ 115-123 (Rehabilitation Act); SAC ¶¶ 124-134 (ACA). In articulating how she has been harmed by Defendants, she makes no mention CVS Caremark's role in her insurance dropping coverage. Nor is it at all clear she could state a claim on that basis.[4]

---

[4] Furthermore, the terms of her prescription benefit plan are not a public accommodation and cannot be challenged under the ADA. See Doe v. CVS Pharmacy, Inc., 982 F.3d 1204, 1212, 1213, 1213 n.3 (9th Cir. 2020). If she cannot challenge the terms of her prescription benefit plan as discriminatory, it is unclear how she could challenge whatever role CVS Caremark may have played in shaping the terms of that plan.

10

These facts are too sparse and the role of CVS Caremark in perpetuating the harm alleged is too ambiguous to keep CVS Caremark in the case, even at this early juncture. Therefore, Defendants' Motion is GRANTED as to CVS Caremark.

B. Discrimination

As explained in this Court's prior Order, Plaintiff's claims under the ADA, Rehabilitation Act, and ACA may be analyzed together. See Mem. & Order 7; see also Nunes v. Massachusetts Dept. of Correction, 766 F.3d 136, 144 (1st Cir. 2014). Under all three statutes, Ms. Fuog must make out a prima facie case that: "(1) [s]he has a disability as defined by the statutes, (2) [s]he was 'otherwise qualified' for the program, (3) the statutes apply to the [entity engaging in the discrimination], and (4) that [the entity] discriminated against [her] as an individual with a disability (for example, failing to provide a reasonable accommodation)." Driscoll v. Bryant University, 393 F.Supp.3d 153, 159 (D.R.I. 2019).

Ultimately, this case hinges on the fourth factor. The fight over whether this policy is discriminatory takes place on three fronts: a disparate treatment theory, premised most compellingly on proxy-discrimination; a disparate impact theory, under the meaningful access standard; and a claim for failure to make a reasonable accommodation. CVS argues that even if it has the

policy Ms. Fuog describes, it would not be discriminatory under any of these theories.  MTD Mem. 13.

### 1.  Disparate Treatment

As the Court noted in its previous Order, because not all persons with prescriptions over the threshold amounts are disabled, the policy alleged is facially neutral, applying to the disabled and non-disabled alike.  See Mem. & Order 8-10.  This is in part because a dose and duration threshold does not distinguish between longstanding conditions that qualify as disabilities, and "temporary, non-chronic impairments of short duration." Presutti v. Felton Brush, Inc., 927 F. Supp. 545, 548 (D.N.H. 1995) (distinguishing between impairment and disability, and quoting ADA interpretive guidelines at 29 C.F.R. pt. 1630 App. (1994)).

Plaintiff's best argument on her disparate treatment claim is that discrimination based on large opioid prescriptions is a form of proxy discrimination.  Under this form of the disparate treatment theory, courts have recognized that "a regulation or policy cannot use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination, such as classifications based on gray hair (as a proxy for age) or service dogs or wheelchairs (as proxies for handicapped status)." Community Services. Inc. v. Wind Gap Municipal Authority, 421 F.3d 170, 177-78 (3d Cir. 2005) (internal quotation marks and citation omitted).  A large opioid prescription is, by this argument, the

12

equivalent of a wheelchair – not a perfect correlation with disability, but close enough so that discrimination on the basis of the proxy is essentially discrimination on the basis of disability.

"[T]he crucial question is whether the proxy's 'fit' is 'sufficiently close' to make a discriminatory inference plausible." Schmitt v. Kaiser Found. Health Plan of Washington, 965 F.3d 945, 959 (9th Cir. 2020). Ms. Fuog pleads such a fit and supports her pleading with reference to academic studies showing a reasonably strong correlation between disability and larger opioid prescriptions. The closeness of the fit is a fact-sensitive determination that will require reliable expert testimony. For now, however, Plaintiff's pleading is adequate to find it plausible that a sufficient fit exists to draw the discriminatory inference. That is enough at this early stage.

    2. Disparate Impact

In Alexander v. Choate, 469 U.S. 287 (1985), the Supreme Court "assume[d] without deciding that [section] 504 [of the Rehabilitation Act] reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped,"[5] while at

---

[5] In Doe v. BlueCross BlueShield of Tennessee, Inc., 926 F.3d 235, 241 (6th Cir. 2019), the Sixth Circuit was the first to diverge from its sister circuits and hold that the Rehabilitation Act does not permit disparate impact claims. For the purposes of this Motion, the Court assumes without deciding this unbriefed question that the First Circuit would follow the Second, Seventh,

13

the same time rejecting "the boundless notion that all disparate-impact showings constitute prima facie cases under [section] 504." 469 U.S. at 299. "Rather than try to classify particular instances of discrimination as intentional or disparate-impact, the Court focused on whether disabled persons had been denied 'meaningful access' to [the relevant] services." Doe v. CVS Pharmacy, Inc., 982 F.3d 1204, 1210 (9th Cir. 2020) (citing Choate, 469 U.S. at 302), cert. granted in part, 141 S. Ct. 2882 (2021), and cert. dismissed sub nom. CVS Pharmacy, Inc. v. Doe, One, 142 S. Ct. 480 (2021).

Defining the relevant benefit is a critical first step in this analysis. Id. (reversing the district court for defining the relevant benefit too narrowly). Here, taking Ms. Fuog's argument on the whole, the Court concludes that the relevant benefit is having her prescription filled in accordance with the professional judgment of both her doctor and pharmacist in appropriate consultation. See Resp. Mem. 3-4 ("To be clear, it is not, and was never, Plaintiff's contention that pharmacists should not exercise any judgment in determining whether an opioid prescription is 'legitimate.' Rather, under the CVS Policy, CVS's

---

Ninth, and Tenth Circuits in concluding that, under Alexander v. Choate, at least some disparate impact claims may be brought pursuant to the Rehabilitation Act. 469 U.S. 287 (1985); see also generally Pet. Writ Cert. 16-20, CVS Pharmacy v. Doe, One, No. 20-1374 (cert. dismissed Nov. 12, 2021).

14

pharmacists were and are in fact <u>not</u> attempting to determine whether an opioid prescription[] is legitimate but were and are refusing to fill certain opioid prescriptions even though they are legitimate."); <u>id.</u> at 14-15 ("Plaintiff's complaint with the CVS Policy is not that it requires the pharmacist to exercise professional judgment in filling opioid prescriptions, but, on the contrary, that it effectively seeks to override that judgment when the opioid prescription exceeds the CDC Guideline dose and duration thresholds."); <u>id.</u> at 18 (arguing that Defendants' policy "interferes with the exercise of professional judgment by encouraging and incentivizing the pharmacists to refuse to fill certain opioid prescriptions <u>even if the prescriptions are issued by a licensed prescriber for a legitimate medical purpose</u>."). Cf. <u>CVS v. Doe</u>, 982 F.3d at 1210 ("Does have adequately alleged that they were denied meaningful access to their prescription drug benefit, including medically appropriate dispensing of their medications and access to necessary [pharmaceutical] counseling.").

The second inquiry is whether CVS's policy denies the disabled meaningful access to that benefit. The Court finds the allegation that it does plausible. Specifically, it's plausible that a prescriber's thoughtful, individualized determination of the proper prescription along with a pharmacist's attendant scrutiny of its provenance and legitimacy, both crucial exercises of

15

professional judgment, are precluded by a hard and fast limit on the dose and duration of opioid prescriptions. While CVS has every right and every reason to scrutinize large opioid prescriptions, it cannot do so in a way that cuts the judgment of the doctor and the pharmacist out of the picture through a blanket corporate policy, as alleged.[6]  That professional judgment is essential to the benefit and service CVS pharmacists provide, and an essential part of Ms. Fuog's healthcare more generally.  See Doe, 982 F.3d at 1210 (finding pharmaceutical counseling an essential part of the benefit as defined in the ACA).

Furthermore, Ms. Fuog has pleaded sufficient facts for the Court to conclude that it is plausible that those with prescriptions over the threshold are generally denied meaningful access to this benefit, and also disproportionately or predominately disabled.[7]  In this way, Plaintiff's Second Amended

---

[6] CVS contends that Plaintiff attempts to subject "pharmacies' healthcare judgments to federal discrimination liability, rather than judging them by the ordinary standards of professional practice."  Reply Mem. at 14-15, ECF No. 44.  To the contrary, she alleges it is discriminatory for a corporate policy to interfere with that professional judgment in ways that disparately impact the disabled.

[7] In Smith II, the plaintiff sought to represent a class which encompassed all those with prescriptions that were either over certain MME limits or longer than three or seven days.  2021 WL 3861451, at *6.  Here, Ms. Fuog alleges the policy applies to those who meet both an MME/day requirement (90 MME/day) and the higher duration limit of seven days.  SAC ¶ 46.  Those meeting both criteria, a necessarily smaller class, will have a significantly tighter correlation with disability.

Complaint cures the defects of the first. See Mem. & Order 13-14. She has alleged a specific dose-and-duration threshold and provided well-pleaded facts supporting a strong correlation between those over the threshold and disability. While she will have much to prove as the case progresses, these pleadings push past the plausibility bar.

       3. Reasonable Accommodation

Title III of the ADA prohibits "a failure to make reasonable modifications in policies . . . when such modifications are necessary to afford such goods [and] services . . . to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods [and] services. . . ." 42 U.S.C. § 12182(b)(2)(A)(ii). "To establish a prima facie reasonable accommodation claim, a plaintiff must show that the requested modification is both 'reasonable' and 'necessary'" to allow the disabled to access the goods or services being offered. See Mem. & Order 15 (citing PGA Tour v. Martin, 532 U.S. 661, 683 n.38 (2001) and Beradelli v. Allied Serv. Inst. of Rehab. Med., 900 F.3d 104, 115 (3d Cir. 2018)). An entity "has refused to affirmatively accommodate [the disabled person's] disability where such accommodation was needed to provide 'meaningful access to a public service.'" Nunes, 766 F.3d at 145 (citing Henrietta D. v. Bloomberg, 331 F.3d 261, 273-76 (2d Cir. 2003)).

CVS makes three arguments against a reasonable accommodation theory: (1) that Ms. Fuog failed to request the accommodation; (2) that this purported modification would amount to a wholesale abandonment of its policy, which is not required; and (3) that because the purported policy also denies access to non-disabled individuals with sufficiently large prescriptions, any failure to modify would not give disabled individuals "opportunities possessed by similar non-disabled people." MTD Mem. 19; id. 18-20; Reply Mem. ("Reply") 13-14, ECF No. 44.

The Court finds these arguments unavailing. CVS itself appears to agree with Plaintiff in describing the modification request to be "that the CDC Guideline not be applied as 'fixed limits' that result in 'refus[al] to fill legitimate opioid prescriptions as written.'" Reply 14 (quoting SAC ¶ 34). Crafting some reasonable process of prior approval, appeal of denials, and/or additional scrutiny, a process which constitutes a viable path of access for patients who genuinely need large opioid prescriptions, is plausibly pleaded as a reasonable accommodation request. And, such a path is entirely consistent with the requests that Ms. Fuog made both to specific pharmacists, when she begged them to review her medical records, and also to CVS corporate in writing. SAC ¶ 99.

Nor would such a review process require that CVS entirely abandon a policy of added scrutiny or review for large opioid

prescriptions. In the midst of a lethal opioid epidemic, it may be entirely reasonable for CVS to have a policy to evaluate large opioid prescriptions carefully. See Ruskai v. Pistole, 775 F.3d 61, 79 (1st Cir. 2014) (increased likelihood of pat down searches at airport security was reasonable and could not support a claim of disability discrimination).

Finally, CVS defines the comparator class too narrowly when it argues that since it (purportedly) denies access to all individuals with prescriptions over the threshold, a reasonable modification would give the disabled access to a benefit which the non-disabled cannot access either. MTD Mem. 19. Rather, as noted, the benefit in question is properly defined as access to the professional judgment of a prescriber and pharmacist acting in consultation. A working process of denial review and appeal might be shown to be reasonable and necessary to give the disabled, who have disproportionately large opioid prescriptions, meaningful access to this benefit on the same terms as others who have been prescribed opioids. Such an accommodation could protect both the interests behind CVS's policy and Ms. Fuog's rights under the ADA, ACA, and Rehabilitation Act. Ms. Fuog has therefore pleaded that she was denied a reasonable accommodation.

IV. CONCLUSION

For the reasons contained herein, Defendants' Motion to Dismiss, ECF No. 42, is GRANTED in part, and DENIED in part. IT IS SO ORDERED.

/s/ William E. Smith
_____
William E. Smith
District Judge
Date: May 10, 2022